Case 4:23-cv-00108   Document 47   Filed on 05/06/24 in TXSD   Page 1 of 14

United States District Court
Southern District of Texas
**ENTERED**
May 06, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PCS SOFTWARE, INC., § § § | |
| Plaintiff, § | |
| v. § | CIVIL ACTION NO. H-23-108 |
| § | |
| DISPATCH SERVICES, INC., § § § | |
| Defendant. § | |

**MEMORANDUM AND OPINION**

Dispatch Services, Inc., contracted with PCS Software, Inc. for a software license. Dispatch quickly learned that the software did not meet its needs, so it stopped paying PCS the contractual setup and subscription fees. PCS sued for breach of contract. Dispatch counterclaimed, alleging fraudulent inducement. This opinion grants in part and denies in part PCS's motion to dismiss Dispatch's counterclaims. The reasons are set out below.

**I.      Background**

PCS Software, Inc. provides "cloud-based transportation management software." (Docket Entry No. 6 at ¶ 7). Dispatch Services, Inc, is a "third-party logistics provider and freight brokerage company." (*Id.* at ¶ 8; Docket Entry No. 28 at 6). Dispatch "connects clients with truck owner-operators and manages the transportation of freight across the United States and Canada." (Docket Entry No. 6 at ¶ 8). To do so, Dispatch depends on "Transportation Management Software." (Docket Entry No. 28 at 6).

Russia's invasion of Ukraine created "logistical issues" for Dispatch's transportation management software service. (*Id.*). Dispatch entered into discussions with PCS in an effort to "find a suitable replacement" for Dispatch's software "capable of meeting all its specific transportation management needs." (*Id.* at 6–7). In those discussions, Dispatch alleges that PCS

represented that its software "could not only replace Dispatch's current system as a functional alternative, but also meet various specifications that Dispatch's current system allows and which Dispatch relies upon in its ordinary course of business." (*Id.* at 7). PCS also allegedly "represented the Software had functions that Dispatch communicated were crucial to its decision to replace its current management system." (*Id.*).

A. The Agreement

In June 2022, relying on PCS's representations that its software would meet Dispatch's specific needs, Dispatch executed a software licensing agreement with PCS (the "Agreement"). Under the Agreement, PCS promised to "grant[] to [Dispatch] during [] [an initial three-year term] a personal, non-exclusive, non-transferable, and royalty-free license to access and use [PCS's software] for [Dispatch]'s internal business purposes and not for the benefit of any third party." (Docket Entry No. 6-1 at 5). In exchange, Dispatch agreed to pay "applicable fees and charges," including a $108,639 "setup fee" and a monthly subscription fee "[c]ommencing upon [Dispatch]'s initial use of the [software]." (*Id.* at 3, 5, 18).

The Agreement contained the following "as is" clause:

> EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 6.1, THE SERVICE AND ALL PRODUCTS ARE PROVIDED "AS IS". PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE. WITHOUT LIMITING THE FOREGOING, PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE SERVICE OR PRODUCTS, OR ANY OUTPUT OR RESULTS OF THE USE THEREOF, WILL MEET CLIENT'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE. ALL THIRD-PARTY MATERIALS ARE PROVIDED "AS IS", AND ANY REPRESENTATION OR WARRANTY OF OR CONCERNING ANY THIRD-PARTY MATERIALS IS STRICTLY BETWEEN CLIENT AND THE THIRD-PARTY OWNER OR DISTRIBUTOR OF SUCH THIRD-PARTY MATERIALS.

(*Id.* at 8).

The Agreement also contained the following integration clause:

> This Agreement and any relevant license agreement(s), constitute the entire agreement between [Dispatch] and PCS, and supersedes any and all prior agreements, negotiations and communications (whether written, oral or electronic) with respect to the Service. No change, modification, or waiver of the terms and conditions of this Agreement, shall be binding on PCS unless made in writing by PCS. However, Client acknowledges that applicable FCC rules and regulations are subject to change and that PCS may freely and without liability to [Dispatch], modify this Agreement to the extent necessary to comply with such FCC rules.

(*Id.* at 14).

### B. PCS's Allegations of Contract Breach

Shortly after the parties executed the Agreement, PCS alleges that Dispatch ceased paying its subscription fees and setup fee installments. (Docket Entry No. 6 at ¶ 14). PCS alleges that Dispatch never paid the overdue fees and, since November 2022, has ignored PCS's requests for payment. (*Id.* at ¶ 16).

In November 2022, PCS gave Dispatch written notice that it was in breach "by failing to pay its outstanding invoice balance, and that failure to cure the breach by bringing its account current would result in suspension of services." (*Id.* at ¶ 17). A few days after sending this notice, PCS suspended Dispatch's access to the software. (*Id.*).

In December 2022, PCS sent Dispatch a formal demand letter, invoking the Agreement's acceleration clause for immediate payment of "all fees that would have become payable had the [Agreement] remained in effect until expiration of the Term." (*Id.* at ¶ 18). PCS notified Dispatch of PCS's termination of the Agreement and demanded payment for the full contract amount of $1,437,426. (*Id.*).

### C. This Lawsuit

In January 2023, PCS filed this action against Dispatch, asserting causes of action for breach of contract and quantum meruit. (Docket Entry Nos. 1, 6). Dispatch answered and asserted

3

counterclaims for: (1) unconscionability; (2) negligent misrepresentation; (3) fraudulent misrepresentation; (4) fraudulent inducement; (5) breach of warranty; (6) violation of the Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE § 17.46 *et seq.*; and (7) breach of the implied duty of good faith and fair dealing. (Docket Entry No. 28). PCS moved to dismiss Dispatch's counterclaims under Federal Rule of Civil Procedure 12(b)(6). (Docket Entry No. 32). Dispatch responded, (Docket Entry No. 43), and PCS replied, (Docket Entry No. 44).

Based on the pleadings, the briefs, and the applicable law, the motion to dismiss is granted in part and denied in part. The following claims are dismissed without prejudice: fraudulent misrepresentation, fraudulent inducement, unconscionability, and breach of warranty. The DTPA claim and claim for breach of the implied duty of good faith and fair dealing are dismissed with prejudice. The negligent misrepresentation claim withstands the motion to dismiss.

The reasons for these rulings are set out below.

**II.      The Legal Standards**

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out*.*" *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation and quoting reference omitted).

Counterclaims asserted in an answer are subject to the same pleading standards as complaints. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).

**III.     Analysis**

    **A.     The Fraud Claims**

Dispatch's counterclaims for fraudulent misrepresentation and fraudulent inducement do not allege the "who, what, when, where, and how" necessary in pleading fraud. Dispatch alleges that PCS made the alleged misrepresentations but does not identify any PCS individual employee or representative who made the statements. *See Meyers v. Textron Fin. Corp.*, No. 4:11-CV-624-A, 2011 WL 4590796, at *2 (N.D. Tex. Oct. 4, 2011) (dismissing fraudulent inducement claims because "[n]ot once did plaintiffs identify by name any person who made any alleged misrepresentation" and stating that "[t]he requirement that the identity of the person allegedly making the misrepresentation be alleged means that the bare allegation that a corporation made a representation is not sufficient").

Dispatch does not allege when the alleged misrepresentations were made, besides alleging generally that they were made "prior to executing the Agreement." (Docket Entry No. 28 at ¶ 10). Dispatch references "meetings and phone calls" on "several occasions," (*id.* at ¶ 7(a)), but this is insufficiently specific to satisfy Rule 9(b). *See Meyers*, 2011 WL 4590796, at *2 (dismissing fraud-based claims and noting that "[e]xcept for unacceptable general allegations, such as 'in September 2008' or 'in early 2009,' the 'when' element of particularity is absent from plaintiffs' allegations"); *Diaz v. Deutsche Bank*, No. 5:14-CV-121, 2015 WL 12777391, at *5 (S.D. Tex. Apr. 14, 2015) ("Plaintiff vaguely indicated that discussions began with Defendant 'in the spring/summer of 2013' . . . these generalized time periods are not specific enough to meet the pleading requirements of Rule 9(b)."); *Guerrero v. Bank of Am. N.A.*, No. H-17-239, 2017 WL 2876504, at *2 (S.D. Tex. July 6, 2017) (Rule 9(b) was not met when the plaintiff alleged that misrepresentations were made on "numerous occasions during 2010–2016"); *Maisa Prop., Inc. v. Cathay Bank*, No. 4:12-CV-066-A, 2012 WL 1563938, at *3 (N.D. Tex. May 2, 2012) ("Incomplete identifications of the speaker and vague references to the date are simply not sufficient to give Cathay fair notice of when the allegations took place.").

6

Finally, Dispatch does not allege how and where the alleged misrepresentations were made. Dispatch is located in North Carolina and PCS is located in Texas. (Docket Entry No. 28 at ¶¶ 1–2). Dispatch does not specify in which state the alleged misrepresentations were made. *See Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 797 (N.D. Tex. 2009) (dismissing fraud claims, noting that the plaintiffs had failed to answer the "where" question by "failing to specify even the state, much less a more precise location, in which these representations were made"). Nor does Dispatch specify whether the alleged misrepresentations were oral or written. *See id.* (stating that the plaintiffs "do not answer the 'how' by failing to specify whether a statement was oral or written").

Dispatch's fraud claims are dismissed without prejudice to amendment in an attempt to address the deficiencies.

**B.     The Unconscionability Claim**

The doctrine of unconscionability is a defense to a breach of contract claim that, if established, results in a conclusion that the contract is unenforceable. *See In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). It is not an affirmative claim for relief, except under the DTPA. *Philadelphia Indem. Ins. Co. v. SSR Hospitality, Inc.*, 459 Fed. App'x. 308, 314 n.19 (5th Cir. 2012). "A contract is unenforceable if, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re Poly-America, L.P.*, 262 S.W.3d at 348 (quotation marks and quoting reference omitted). "[I]n general, a contract will be found unconscionable if it is grossly one-sided." *Id.* (citations omitted). "A contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience." *Besteman*

7

*v. Pitcock*, 272 S.W.3d 777, 789 (Tex. App.—Texarkana 2008, no pet.) (citation omitted and alteration adopted).

Dispatch has not identified a contractual term, or an aspect of the contracting process, that allows the court to reasonably infer unconscionability. Dispatch alleges that its Agreement with PCS "is unconscionable because, if enforced, it provides for a gross disparity in the values exchanged. PCS never provided a Software as a Service that Dispatch could actually use. Dispatch was never able to use the service it bargained for, for the purposes contemplated." (Docket Entry No. 28 at ¶ 18). In essence, Dispatch's argument is that the Agreement is unconscionable because PCS did not perform on its promise to deliver software that could provide and perform certain functions. These are allegations supporting a claim for breach of contract, not unconscionability. *See Shakeri v. ADT Sec. Services, Inc.*, 816 F.3d 283, 295 (5th Cir. 2016) ("[T]he claim for unconscionable conduct before us amounts to a breach of contract claim. Thus, the district court did not err in dismissing Plaintiffs' unconscionable conduct claim.").

Dispatch's unconscionability claim is dismissed without prejudice to replead unconscionability as an affirmative defense to PCS's breach of contract claim, if the facts support unconscionability on grounds distinct from mere breach.

**C.    The Claim for Breach of the Implied Duty of Good Faith and Fair Dealing**

Dispatch alleges that PCS "breached the Implied Duty of Good Faith and Fair Dealing by making false and fraudulent representations about the core functions that its software could provide at the time of signing the contract, and by failing to provide the Software that the parties agreed to and anticipated that would be provided when signing the Contract." (Docket Entry No. 28 at ¶ 45). Dispatch alleges that PCS "prevented Dispatch from obtaining the benefit of its bargain by continually delaying the implementation process." (*Id.* at ¶ 46).

8

PCS argues that Dispatch's claim for breach of the implied duty of good faith and fair dealing is "really a breach of contract claim." (Docket Entry No. 32 at 15). PCS also argues that no duty to act in good faith exists absent a special relationship and that Dispatch has not alleged facts giving rise to a special relationship. (*Id.*).

In response, Dispatch cites § 1.304 of the Texas Business and Commerce Code, which provides that "every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." (Docket Entry No. 43 at 3). Dispatch also contends that a special relationship existed between the parties based on "an imbalance of bargaining power with respect to performance and enforcement" of the contract. (*Id.* at 4). That alleged imbalance consists in the parties' unequal rights to terminate the Agreement. According to Dispatch:

> If Dispatch breaches by failing to pay the subscription fee, PCS can terminate the agreement, revoke access to the Software, and seek collection of three years of subscription payments regardless of how far the Parties are into the initial term.
>
> If PCS breaches by failing to make "commercially reasonable efforts to maintain the Service in working condition," then PCS does not incur liability for the outage and if Dispatch were to use the breach as grounds for termination, Dispatch would still be on the hook for the three years of subscription payments.

(*Id.* at 4–5).

Dispatch is correct that Texas does not recognize a standalone cause of action for breach of the implied duty of good faith and fair dealing on the facts alleged. Texas law rejects "a generalized contractual duty of good faith and fair dealing . . . in almost all circumstances." *Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016) (citing *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983)). "But in an extremely narrow class of cases, the Texas courts have determined that a special relationship may give rise to a tort duty of good faith and fair dealing." *Id.* (citing *Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)).

This case is not one of the "extremely narrow class[es] of cases" in which Texas recognizes a special relationship. Dispatch does not allege facts giving rise to a formal fiduciary relationship.

9

*See id.* Nor has Dispatch alleged facts giving rise to a special or confidential relationship. *See id.* These relationships are "earmarked by specific characteristics including: long standing relations, an imbalance of bargaining power, and significant trust and confidence shared by the parties." *Id.* (quoting *Caton v. Leach Corp.*, 896 F.2d 939, 948 (5th Cir. 1990)). Importantly, "[t]he relationship must exist before and apart from the contract or agreement that forms the basis of the controversy." *Id.* (citing *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995)). Dispatch argues in its response brief that there was an "imbalance of bargaining power" between it and PCS, but Dispatch does not allege facts supporting this inference. And neither Dispatch nor PCS alleges facts supporting an inference that their relationship preexisted the contract in any meaningful respect.

Dispatch's claim for breach of the implied duty of good faith and fair dealing is dismissed with prejudice because amendment would be futile.

### D. The Breach of Warranty Claim

Dispatch alleges that "PCS breached the express and implied warranties made during negotiations, in the contract, and during the course of the parties' dealings during the failed implementation phase." (Docket Entry No. 28 at ¶ 40). PCS responds that Dispatch's breach of warranty claim is barred by the Agreement's "as is" clause:

> EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 6.1, THE SERVICE AND ALL PRODUCTS ARE PROVIDED "AS IS". PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE. WITHOUT LIMITING THE FOREGOING, PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE SERVICE OR PRODUCTS, OR ANY OUTPUT OR RESULTS OF THE USE THEREOF, WILL MEET CLIENT'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE. ALL THIRD-PARTY MATERIALS ARE PROVIDED "AS IS", AND ANY REPRESENTATION OR WARRANTY OF OR CONCERNING ANY THIRD-

PARTY MATERIALS IS STRICTLY BETWEEN CLIENT AND THE THIRD-PARTY OWNER OR DISTRIBUTOR OF SUCH THIRD-PARTY MATERIALS.

(Docket Entry No. 6-1 at 7).

Dispatch responds that its allegations of fraudulent inducement "call[] into question the validity of the Contract," including the "as is" clause. (Docket Entry No. 43 at 5). Dispatch is correct that fraudulent inducement is "a circumstance that [can] render[]" an "as is" clause unenforceable. *Dunbar Med. Sys. Inc. v. Gammex Inc.*, 216 F.3d 441, 450 (5th Cir. 2000); *Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). However, Dispatch's argument is unavailing because, as explained, its fraudulent inducement allegations are deficient. The "as is" clause is therefore presumptively enforceable. *See Clark v. Mustang Mach. Co., Ltd.*, 571 S.W.3d 305, 308 (Tex. App.—Houston [1st Dist.] 2018, no pet.). And because the clause unambiguously disclaims all warranties except those set out in section 6.1, which are irrelevant here,[1] Dispatch's breach of warranty claim is dismissed. The dismissal is without prejudice to amendment or to arguing, at a later stage, that the "as is" clause is invalid or unenforceable.

---

[1] Section 6.1 provides: "Each party represents and warrants that:

> **6.1.1** it is duly organized, validly existing, and in good standing as a corporation or other entity under the laws of the jurisdiction of its incorporation or other organization;
>
> **6.1.2** it has the full right, power, and authority to enter into and perform its obligations and grant the rights, licenses, consents, and authorizations it grants or is required to grant under this Agreement;
>
> **6.1.3** the execution of this Agreement by its representative whose signature is set forth at the end of this Agreement has been duly authorized by all necessary corporate or organizational action of such Party; and
>
> **6.1.4** when executed and delivered by both Parties, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

(Docket Entry No. 6-1 at 7).

E.     The Negligent Misrepresentation Claim

In support of its negligent misrepresentation claim, Dispatch alleges that "PCS supplied false information regarding the Software's actual existing capabilities as a transportation management service" and did not "exercise reasonable care or competence in communicating the actual capability of the Software to provide the Service according to Dispatch's needs." (Docket Entry No. 28 at ¶¶ 23, 25).

PCS argues that Dispatch's negligent misrepresentation claim is barred by the Agreement's integration clause, which provides:

> This Agreement and any relevant license agreement(s), constitute the entire agreement between [Dispatch] and PCS, and supersedes any and all prior agreements, negotiations and communications (whether written, oral or electronic) with respect to the Service. No change, modification, or waiver of the terms and conditions of this Agreement, shall be binding on PCS unless made in writing by PCS. However, Client acknowledges that applicable FCC rules and regulations are subject to change and that PCS may freely and without liability to [Dispatch], modify this Agreement to the extent necessary to comply with such FCC rules.

Dispatch responds that "PCS's contentions presuppose that the [Agreement] and [the integration provision is] valid. Dispatch has alleged claims for fraudulent inducement, and a 'contract is subject to avoidance on the ground of fraudulent inducement.'" (Docket Entry No. 43 at 5 (quoting *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990); citing RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. C (1981)); *Italian Cowboy Partners, Ltd v. Prudential Ins. Co. of America*, 341 S.W.3d 323, 327 (Tex. 2011)).

The court is unpersuaded by PCS's argument that Dispatch's negligent misrepresentation claim is barred by the integration clause. The Texas Supreme Court has drawn a distinction between "[p]ure merger clauses," which "have never had the effect of precluding" reasonable reliance, and clauses that "clear[ly] and unequivocal[ly]" express an "intent to disclaim reliance or waive claims." *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 334. The integration clause on which PCS relies merely "achieves the purpose of ensuring that the contract at issue invalidates or

12

supersedes any previous agreements, as well as negating the apparent authority of an agent to later modify the contract's terms." *Id.* It does not expressly disclaim reliance on any extracontractual representations, and so it does not defeat reasonable reliance as a matter of law. *See id.* at 335.

Dispatch's negligent misrepresentation claim withstands PCS's motion to dismiss.

### F.     The DTPA Claim

Dispatch alleges that PCS violated the DTPA's prohibition on false, deceptive, and misleading business acts and practices through its "statements to induce Dispatch into signing the contract, and to encourage Dispatch to continue making payments and working with PCS despite continual material issues in PCS's performance including but not limited to a failure of the Software to perform core functions, and delays which were wholly the fault of PCS." (Docket Entry No. 28 at ¶ 43).

Dispatch's DTPA allegations are deficient for two reasons. First, as explained above, Dispatch's fraud based DTPA claim does not satisfy the "who, what, when, where, and how" required by Rule 9(b). *See Williams*, 112 F.3d at 179; *See Gunes v. Jaguar Land Rover N. Am. LLC*, No. 4:22-CV-02410, 2023 WL 6370780, at *3 (S.D. Tex. May 24, 2023) ("Claims alleging violations of the DTPA are subject to the requirements of Rule 9(b).") (citing *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

Second, the value of the Agreement—$1.3 million, (Docket Entry No. 6-1 at 18)—triggers the DTPA's large-transaction exemption, which provides:

> Nothing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence.

TEX. BUS. & COM. CODE § 17.49(g).

Dispatch's DTPA claim is dismissed with prejudice because the large-transaction exemption makes further amendment futile.

### IV.     Conclusion

PCS's motion to dismiss is granted in part. (Docket Entry No. 32). The following claims are dismissed without prejudice: fraudulent misrepresentation, fraudulent inducement, unconscionability, and breach of warranty. The DTPA claim and claim for breach of the implied duty of good faith and fair dealing are dismissed with prejudice. The negligent misrepresentation claim may proceed.

SIGNED on May 6, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge