United States District Court
Southern District of Texas
**ENTERED**
January 28, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PCS SOFTWARE INC., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-23-108 |
| | § | |
| DISPATCH SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**MEMORANDUM AND OPINION**

In 2022, Dispatch Services, Inc. contracted with PCS Software, Inc. for transportation management software and related services.  PCS alleges that after it provided the software and services, Dispatch made some payments but stopped paying far short of the amounts due.  PCS sued Dispatch for breach of contract and, alternatively, quantum meruit.  (Docket Entry Nos. 1, 6).  Dispatch answered and counterclaimed for fraudulent inducement and related causes of action.  (Docket Entry Nos. 28, 49).  Dispatch's counterclaims have been dismissed.  (Docket Entry Nos. 47, 54, 85).

PCS now moves for summary judgment on its breach of contract claim.  (Docket Entry No. 59).  Dispatch responded, (Docket Entry No. 62), and PCS replied, (Docket Entry No. 69).  Without seeking leave from the court, Dispatch filed a "surresponse."  (Docket Entry No. 73).  PCS also filed objections to Dispatch's summary judgment evidence, (Docket Entry No. 70), to which Dispatch responded, (Docket Entry No. 72).[1]

---

[1] As detailed below, PCS's objections to Dispatch's expert report and paragraph 5 of Jacob Hoover's affidavit, (Docket Entry No. 70 at 1–3), are denied.  PCS's other objections to Dispatch's summary judgment evidence are dismissed as moot.

Based on the record, the briefing, the parties' arguments at oral hearings, and the applicable law, the court grants in part and denies in part PCS's motion for summary judgment. The reasons for these rulings are below.

## I.    Background

Dispatch is a "third-party logistics provider and freight brokerage company." (Docket Entry No. 28 at 6); (Docket Entry No. 6 at ¶ 8). Dispatch "connects clients with truck owner-operators and manages the transportation of freight across the United States and Canada." (Docket Entry No. 6 at ¶ 8). Dispatch depends on "transportation management software," which is the type of software that PCS offers. (Docket Entry No. 28 at 6); (Docket Entry No. 6 at ¶ 7).

Dispatch and PCS executed the "Software as a Service Agreement" on June 6, 2022. (Docket Entry No. 62-1). Under the Agreement, Dispatch agreed to purchase a subscription to PCS's software for an "Initial Term" of three years, starting on the date of Dispatch's "initial use of the Service." (*Id.* § 2.1). The Agreement required two categories of payment from Dispatch to PCS: the Implementation Fee and the Subscription Fee. (*Id.* at 18–19). Half of the Implementation Fee was due "starting on Product implementation commences [sic]" and "payable in 3 monthly installments of $18,106.33." (*Id.* at 19). The other half was "due and payable at go live, and will be billed in 3 monthly installments of $18,106.33 upon the earlier of (a) [Dispatch's] first production use of any Products or (b) sixty (60) days after the Product implementation commences." (*Id.*). The Subscription Fee was $39,000 per month. (*Id.* at 18).

The record includes three checks from Dispatch to PCS: $18,106.50 on June 29, 2022, (Docket Entry No. 59-9); $39,000 on June 29, 2022, (Docket Entry No. 59-7); and $18,106.50 on July 13, 2022, (Docket Entry No. 59-11). There is no evidence that Dispatch paid PCS other

amounts.  PCS suspended Dispatch's access to the software in November 2022 and sued Dispatch

for breach of contract in January 2023.  (Docket Entry Nos. 1, 59-21).

## II.    The Legal Standard for Summary Judgment

"Summary judgment is appropriate where 'the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

*Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th

Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it 'might affect the outcome of

the suit.'"  *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is genuine 'if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*

(quoting *Anderson*, 477 U.S. at 248).  When considering a motion for summary judgment, the

court "must consider all facts and evidence in the light most favorable to the nonmoving party"

and "must draw all reasonable inferences in favor of the nonmoving party."  *Ion v. Chevron USA,

Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion" and pointing to record evidence demonstrating that there is no genuine

dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV.

P. 56(c).  "When 'the non-movant bears the burden of proof at trial,' a party moving for summary

judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the

burden of demonstrating by competent summary judgment proof that there is a dispute of material

fact warranting trial.'"  *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration

adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th

Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250–51).

## III. Analysis

PCS has moved for summary judgment on its breach of contract claim.[2] Under Texas law, the elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the

---

[2] PCS alternatively pleaded a claim for quantum meruit. (Docket Entry No. 6 at ¶¶ 24–25). Because PCS did not move for summary judgment on that claim, *see* (Docket Entry No. 59), this opinion does not address it.

4

defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting reference omitted).

Dispatch concedes that the Agreement is a valid and binding contract. (Docket Entry No. 62 at 4). Although the parties dispute the damages amount, there is no genuine dispute that PCS sustained at least some damages. The issues are whether PCS performed, whether Dispatch breached, and the appropriate damages.

### A.    PCS's Performance

Dispatch argues that, regardless of its own failures to pay, summary judgment cannot be granted because PCS has failed to establish that it performed. Under the Agreement, PCS was obligated to grant Dispatch a license to access and use its software and to provide some implementation-related services. (Docket Entry No. 62-1 § 4.1–4.11). The Agreement contains an "as is" clause that unambiguously disclaims all warranties except for certain enumerated warranties irrelevant to this case. (*Id.* § 6.3).

Much of Dispatch's argument relies on its assertion that PCS did not—and could not—provide the type of software and services that it contracted to provide Dispatch. *See, e.g.*, (Docket Entry No. 79 at 1–2); *see also* (*id.* at 2–3) (relying on evidence of PCS's alleged misrepresentations and emails to suggest that PCS lacked relevant experience). This argument appears to overlap with Dispatch's affirmative defense that PCS's alleged failure "to fulfill its obligations to provide software services capable of [Dispatch's] use" was a "material breach of the Agreement by PCS, and thus discharged Dispatch of its obligation to perform." (Docket Entry No. 49 at 5); *see Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

5

There is no record evidence that PCS or its software program was incapable of performing under the Agreement. To the contrary, it is undisputed that PCS granted Dispatch a license to access and use its software program for transportation management. The record contains undisputed evidence that PCS began implementing the software for Dispatch after the Agreement was signed, including making at least one site visit to Dispatch and setting up a cloud hosting service. (Docket Entry No. 59-19 at ¶¶ 6–7). That is evidence that PCS was performing its contractual obligations when Dispatch stopped paying the Implementation and Subscription Fees.

The inferences Dispatch seeks to draw from PCS's pre-contract emails and statements do not raise a factual dispute as to whether PCS and its software could perform its obligations under the Agreement. The Agreement did not obligate PCS to provide "software services capable of [Dispatch's] use." *See* (Docket Entry No. 49 at 5). To the contrary, the "as is" clause unambiguously disclaimed all implied warranties, (Docket Entry No. 62-1 § 6.3), and this court has already dismissed Dispatch's breach of warranty claim, (Docket Entry No. 47). Nor does the fact that PCS pushed the target go-live date back ten days raise an inference as to PCS's lack of competence that precludes summary judgment. *See* (Docket Entry No. 62 at 7). The Agreement did not require implementation to be completed within a certain time, and it was Dispatch who stopped communicating with PCS during the implementation phase. (Docket Entry No. 59-21 at 3).

Nor does the fact that PCS did not complete the software integration preclude summary judgment. Dispatch states on the first page of its response that it "ceased making payments to PCS while PCS continued to attempt to configure its Software." (Docket Entry No. 62 at 1). After more than three months of continuing to work on the software configuration, without payment, PCS suspended Dispatch's access to the software and then issued a demand letter terminating the

Agreement for material breach.  (Docket Entry No. 59-19 at ¶¶ 12, 13).  In other words, PCS stopped performing only after Dispatch stopped paying.  *See* (Docket Entry No. 62-1 § 2.3).

PCS has presented evidence that it was performing under the Agreement when Dispatch stopped payments and communication.  Dispatch has not presented contrary evidence raising a factual dispute material to determining whether PCS's performance was so deficient that it constituted a material breach and justified Dispatch's failure to pay.

**B.    Dispatch's Breach**

PCS alleges that Dispatch breached by (1) failing to pay at least some of the Implementation Fee, and (2) failing to pay the Subscription Fees for July through November 2022.

**1.    The Implementation Fee**

The total Implementation Fee was $108.637.98.  (Docket Entry No. 62-1 at 19).  The Agreement provided that the Fee would be divided into two halves, payable in a total of six monthly installments of $18,106.33.  (*Id.*).

Dispatch was due to pay the first three monthly installments "starting on Product implementation commences [sic]."  (*Id.*).  Dispatch issued one check for $18,106.50 to PCS on June 29, 2022, and another in the same amount on July 13, 2022.  (Docket Entry Nos. 59-7, 59-11).  PCS alleges these were the first two monthly installment checks for the first half of the Implementation Fee, and Dispatch offers no evidence contradicting that conclusion.  Dispatch never paid the third monthly installment of the first half of the Implementation Fee, and it offers no explanation for that failure to pay.  *See* (Docket Entry No. 76 at 13).  The court concludes, as a matter of law, that Dispatch materially breached the Agreement by failing to pay the third monthly installment of the Implementation Fee.

There is significant confusion between the parties about what triggered the payment of the second half of the Implementation Fee.  According to the Agreement, the second half of the Implementation Fee was "due and payable at go live, and will be billed in 3 monthly installments of $18,106.33 upon the earlier of (a) [Dispatch's] first production use of any Products or (b) sixty (60) days after the Product implementation commences."  (Docket Entry No. 62-1 at 19).  It is undisputed that the parties never reached "go live."  (Docket Entry No. 73 at 2); (Docket Entry No. 76 at 16).  PCS initially did not assert that Dispatch's failure to pay the second half of the Implementation Fee was a breach.  *See* (Docket Entry No. 59 at 16).  Dispatch's response took the position that "the second half of implementation fees would become due at the earlier of go-live or sixty days after the start of implementation."  (Docket Entry No. 62 at 8).  Accepting that interpretation, PCS's reply asserted that the failure to pay the second half of the Implementation Fee was a breach—separate from the failure to pay the third installment—because it was undisputed that implementation had commenced.  *See* (Docket Entry No. 76 at 16–17); (Docket Entry No. 69 at 4).  Dispatch then revised its argument, asserting in its surresponse that the second half of the Implementation Fee never became due because the software never reached the "go live" phase.  (Docket Entry No. 73 at 2).

Although the court understands the parties' disagreements, the Agreement clearly states that the Implementation Fee was "due . . . at go live."  (Docket Entry No. 62-1 at 19).  Because the parties agree that the software never went live, the second half of the Implementation Fee did not become due.  Dispatch did not breach the Agreement by failing to pay the second half of the Implementation Fee.

### 2.    The Subscription Fee

Under the Agreement, "[t]he initial term of the Subscription is for three (3) years from the date of [Dispatch's] initial use of the service." (*Id.* § 2.1). The Agreement also states that, "[c]ommencing upon [Dispatch's] initial use of the Service, [Dispatch] will be billed on a monthly basis at the then-current rate for the Service, as set forth more specifically in Exhibit A (the "Subscription Fee")." (*Id.* § 3.1). The Subscription Fee was $39,000 per month. (*Id.* at 18).

Dispatch contends that § 2.1 of the Agreement made Dispatch's initial use of the software a "condition precedent" to the three-year subscription period. PCS argues that, even under Dispatch's interpretation of the Agreement, summary judgment is warranted. The disagreement arises over whether Dispatch "initially use[d]" the software.

Both parties argue, and the court agrees, that the term "initial use" is not ambiguous.[3] "Under Texas law, '[e]ven if a contract is unambiguous as a matter of law, a court may still consider the surrounding facts and circumstances as an aid in the construction of the contract's language.'" *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 234–35 (5th Cir. 2022) (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019)). "In other words, the parol-evidence rule 'does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text.'" *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (quoting *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)). "Those circumstances include . . . the commercial or other setting in which the contract was negotiated and other objectively

---

[3] This determination is consistent with the court's prior rulings. *See* (Docket Entry Nos. 41, 56) (allowing Dispatch's evidence as to the meaning of an unambiguous contract term in light of industry custom).

9

determinable factors that give a context to the transaction between the parties." *Hous. Expl. Co.*, 352 S.W.3d at 469 (quotation marks and quoting reference omitted).

On the other hand, "[e]vidence of the parties' conduct after contract formation is extrinsic evidence that may not be considered when interpreting an unambiguous contract." *ROC-Houston, P.A. v. Parameswaran*, No. 01-22-00613-CV, 2024 WL 3762479, at *7 (Tex. App.—Houston [1st Dist.] Aug. 13, 2024, no pet.) (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981)); *see also E. Montgomery Cnty. Mun. Util. Dist. No. 1 v. Roman Forest Consol. Mun. Util. Dist.*, 620 S.W.2d 110, 112 (Tex. 1981) ("The conduct of the parties i[s] only relevant after the court has determined that the contract is ambiguous.").

According to Dispatch, there is a factual dispute as to the definition of "initial use" that precludes summary judgment on PCS's breach of contract claim. Dispatch argues that "'[i]nitial use' has a specialized and technical meaning in the software industry." (Docket Entry No. 62 at 5). As evidence of that, Dispatch submitted expert testimony that the "normal trade industry practice for the phrase 'initial use' is when software is first used in a commercial environment." (Docket Entry No. 62-4 at 7).[4] PCS responds that even under Dispatch's proposed definition, there is no genuine factual dispute that Dispatch initially used the software.

PCS submitted data representing "weekly logins by Dispatch's users of the Software" and "the number of freight loads that Dispatched logged using the Software on a weekly basis" (referred to as "weekly load counts"). (Docket Entry No. 59-19 at ¶ 7); (Docket Entry No. 59-20). PCS also submitted a declaration from Alan Shaw, its Chief Customer Officer, explaining the load

---

[4] PCS objects to this report on the basis that it is improper parol evidence. (Docket Entry No. 70). But this court has already held that Dispatch's expert report may be used to argue for the specialized technical meaning of "initial use" in the software industry. (Docket Entry No. 56); *see Hess Corp.*, 26 F.4th at 234–35 (affirming the use of expert testimony to interpret the meaning of an unambiguous contractual term in the context of the shipping industry). PCS's objection is overruled.

data.  (Docket Entry No. 59-19).  The weekly load data included some historical data but, according to Mr. Shaw, also included "data concerning then-current shipments, and information about specific trucks."  (Docket Entry No. 19 at ¶ 7).  The graph PCS submitted shows weekly load counts through November 2022.  (Docket Entry No. 59-20).  PCS argues that this data conclusively demonstrates that Dispatch commercially used the software.

Dispatch's response asserted—without citation—that PCS's data does not show commercial use, but rather "shows Dispatch's testing of PCS's software through the upload of historical data and 'dummy' loads that would allow the opportunity to see how the system worked."  (Docket Entry No. 62 at 6).  Without supporting evidence, this statement is insufficient to raise a genuine dispute of material fact.  However, the court gave the parties the opportunity to supplement their summary judgment responses after discovery closed.  Dispatch's supplemental response included a spreadsheet showing, according to Dispatch, that PCS's weekly load data only represented shipments delivered in January 2022—before the Agreement was signed.  (Docket Entry No. 79-1).  Contrary to Mr. Shaw's assertion, Dispatch's spreadsheet suggests that PCS's weekly load data represents only historical shipments that were uploaded several months after the shipment delivery date.  This creates a genuine dispute as to whether PCS's weekly load data shows commercial use or merely testing of the software using historical shipment data.

Dispatch also submitted an affidavit from its Director of Operations, Jacob Hoover, stating that Dispatch never made the transition in its operations from its pre-existing transportation management software to PCS's software.  (Docket Entry No. 62-5 at ¶ 5).[5]  Mr. Hoover's affidavit also stated that Dispatch's weekly load counts were approximately ten times bigger than those

---

[5] The court disagrees with PCS that this statement is wholly conclusory or vague and overrules PCS's objection to this evidence.  (Docket Entry No. 70 at 3).

represented in PCS's dataset.  (Docket Entry No. 62-5 at ¶¶ 6, 7); *see also* (Docket Entry No. 59-20).  Even if the software was used to log only a portion of Dispatch's loads, that does not—by itself—raise a factual dispute as to whether the software was "used in a commercial environment."  Nevertheless, the parties' affidavits tell two different stories about PCS's weekly load data, which further demonstrates that there are open factual disputes as to whether Dispatch initially used the software.  *See Impact Finishing, Inc. v. Wild Card, Inc.*, 713 F. Supp. 3d 322, 349–50 (N.D. Tex. 2024) (competing sworn statements created genuine factual dispute, precluding summary judgment).

Aside from the weekly load data, PCS also submitted evidence—unrefuted by Dispatch—showing that PCS requested, and Dispatch paid, the first Subscription Fee in June of 2022.  (Docket Entry Nos. 59-6, 59-7, 59-15).  To the extent that this evidence is offered to show that Dispatch's conduct after formation of the Agreement sheds light on the meaning of "initial use," the court cannot consider it.  *See ROC-Houston, P.A.*, 2024 WL 3762479, at *7; *Sun Oil Co. (Delaware)*, 626 S.W.2d at 732 (Tex. 1981).  Moreover, in light of the factual disputes discussed previously, this evidence does not establish that PCS is entitled to judgment as a matter of law that Dispatch's failure to pay the remaining Subscription Fees constituted a breach.  PCS is free to argue at trial that Dispatch's payment of the first Subscription Fee is an "objectively determinable factor[] that give[s] a context to the transaction between the parties" and shows that Dispatch initially used the software.  *See Houston Expl. Co.*, 352 S.W.3d at 469 (quoting reference omitted).

The court concludes that genuine disputes of material fact preclude summary judgment as to whether Dispatch breached the Agreement by failing to pay the monthly Subscription Fees after June 2022.

### C.    Dispatch's Affirmative Defenses

As a preliminary matter, Dispatch's counterclaim for negligent misrepresentation has been dismissed, (Docket Entry No. 54), as clarified in this court's recent order.  (Docket Entry No. 85). Even before the court's clarification, Dispatch acknowledged that it no longer had a live negligent misrepresentation claim.  (Docket Entry No. 62 at 4) ("It is undisputed that a valid and binding contractual agreement was made between PCS and Dispatch under the SaaS Agreement."); (Docket Entry No. 72 at 4) ("Dispatch does not rely on the 'Opportunities Won' report to prove its dismissed negligent misrepresentation counterclaim.").   The court has also dismissed Dispatch's claims for breach of warranty, fraud, fraudulent inducement, unconscionability, and breach of the implied duty of good faith and fair dealing.  (Docket Entry Nos. 47, 54).

One of the affirmative defenses that Dispatch asserts is failure of a condition precedent. Dispatch briefed its condition-precedent theory as an argument against its liability on PCS's claim that Dispatch breached the Agreement by failing to pay the Subscription Fees, and the court addressed that argument above.  Dispatch is free to argue its condition-precedent theory at trial, consistent with this opinion.  The court also addressed Dispatch's prior material breach defense above.

In addition to the dismissed counterclaims and the defenses already addressed, Dispatch's answer asserts a list of affirmative defenses, most pleaded in a single sentence.  Dispatch bears the burden of proof at trial on its affirmative defenses.  *See United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 629–30 (5th Cir. 1992).  "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that

there is a dispute of material fact warranting trial.'" *MDK S.R.L.*, 25 F.4th at 368 (alteration adopted) (quoting *Nola Spice Designs, L.L.C.*, 783 F.3d at 536).

PCS moved for summary judgment on "all of Dispatch's affirmative defenses," on the basis that they are unsupported by any evidence. (Docket Entry No. 59 at 20–24) (capitalization adjusted). The motion specifically discussed fraud, the implied duty of good faith and fair dealing, prior material breach, waiver and estoppel, and unconscionability. (*Id.*). Dispatch's response did not name or press *any* of its affirmative defenses. *See* (Docket Entry No. 62 at 8–10). It was not until the "surresponse" that Dispatch named as purported affirmative defenses: "(1) failure to mitigate, (2) condition precedent, (3) implied duty of good faith and fair dealing, (4) false representations intended to induce, (5) fraudulent conduct, (6) failed to fulfil its obligations, (7) waiver and estoppel, and (8) negligence." (Docket Entry No. 73 at 6).[6] Even then, Dispatch did not point to evidence supporting any of these defenses, instead focusing on the evidence of alleged misrepresentations relevant to Dispatch's dismissed counterclaims. In its supplemental brief, Dispatch named a different list of affirmative defenses: "condition precedent, equitable estoppel, waiver, negligent misrepresentation, [and] ratification." (Docket Entry No. 79 at 3). Dispatch is not entitled to a trial based on a general reference to "affirmative defenses" that are only scantily pleaded and inconsistent.

To shift the burden, PCS needed only to "point[] to the absence of evidence supporting [the] affirmative defenses." *See Fed. Debt Mgmt., Inc. v. Herbst Res., Inc.*, No. 93-5203, 1994 WL 24890, *2 (5th Cir. 1994) (per curiam); *see also MDK S.R.L.*, 25 F.4th at 368. Dispatch points

---

[6] In its reply, Dispatch asserted that its response had already provided "legal and factual reasons why summary judgment should not be granted against its affirmative defenses," but cited only to the portion of the response discussing PCS's alleged misrepresentations. (Docket Entry No. 73 at 6 (citing Docket Entry No. 66 at 9–11)).

14

to one district court case in which the court denied summary judgment on a nonmovant's affirmative defenses when the movant failed to list the elements of each defense in its motion for summary judgment. *See Impact Finishing, Inc.*, 713 F. Supp. 3d at 348. But the Fifth Circuit has never adopted that requirement. This court has previously granted summary judgment when the nonmovant's answer "listed 18 barebones affirmative defenses, most pleaded in a single sentence"; the plaintiff moved for summary judgment on the "laundry list of defenses" without listing the elements of the defenses; and the nonmovant failed to respond to the plaintiff's assertion that the affirmative defenses lacked any evidentiary support. *Christiana Tr. v. Bush*, No. 4:16-cv-2505, 2017 WL 2467015, at *3 (S.D. Tex. June 7, 2017); (Case No. 4:16-cv-2505, Docket Entry No. 35 at 13–14).

When PCS pointed to the absence of evidence supporting Dispatch's affirmative defenses, the burden shifted to Dispatch to "demonstrat[e] by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *See MDK S.R.L.*, 25 F.4th at 368 (alteration adopted) (quoting reference omitted). Dispatch's failure to even name its affirmative defenses in its response falls short of that burden. PCS is entitled to summary judgment on Dispatch's affirmative defenses. Dispatch cannot avoid summary judgment based on affirmative defenses that it has not adequately pleaded or identified the summary judgment evidence it relies on in support.

In the interest of thoroughness, the court will briefly address several other reasons why Dispatch's individual affirmative defenses fail. First, PCS's motion presents persuasive arguments that the affirmative defenses of unconscionability, fraud, fraudulent conduct, and implied duty of good faith and fair dealing are foreclosed by this court's prior rulings. (Docket Entry No. 59 at 20–24 & n.3). Dispatch's failure to respond to those legal arguments abandons these defenses. *See Impact Finishing*, 713 F.Supp. at 347 (the defendant abandoned its affirmative defenses by

failing to respond to the plaintiff's legal arguments as to why the affirmative defenses should be dismissed on summary judgment).

Second, Dispatch's concession that the Agreement is a valid contract binding both parties, (Docket Entry No. 62 at 4), is fatal to its affirmative defenses of fraudulent conduct, fraudulent inducement, and negligent inducement. *See Lyn–Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 289 (5th Cir. 2002) ("A fraudulently induced party has not assented to an agreement because the fraudulent conduct precludes the requisite mutual assent.").

Third, Dispatch's supplemental briefing added two defenses—"ratification" and "equitable estoppel"—that its briefing up to that point had not named and were excluded even from the barebones list of affirmative defenses in Dispatch's surresponse. *See* (Docket Entry No. 73 at 6). PCS's motion for summary judgment expressly argued that Dispatch failed to plead facts supporting its ratification defense and had no evidence to support it. (Docket Entry No. 59 at 24). In response, Dispatch was silent. "Equitable estoppel" is not even pleaded. *See* (Docket Entry No. 49). Dispatch's answer provides no factual basis for these defenses, and the court cannot discern how they are relevant. The court doubts whether these defenses were sufficiently pleaded and, regardless, concludes they have been abandoned.

Lastly, to the extent Dispatch is attempting to repackage its breach of warranty counterclaim as an affirmative defense that PCS "failed to fulfil[l] its obligations," that defense is addressed above and precluded by the warranty disclaimer in the Agreement, (Docket Entry No. 62-1 § 6.3), as well as this court's prior rulings, (Docket Entry No. 47 at 11); (Docket Entry No. 54 at 8–9).

### D.    The Amount of Damages

Under Texas law, benefit of the bargain damages are generally recoverable when a party proves all elements of its breach of contract claim.  *See Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453–54 (5th Cir. 2001).  Benefit of the bargain damages "place the injured party as nearly as possible in the position that he would have occupied had the defaulting party performed the contract."  *Id.* at 454.  The parties here do not dispute the fact of damages, just the amount.  *See Dyll v. Adams*, 167 F.3d 945, 947 (5th Cir. 1999) (Texas law distinguishes "between uncertainty about the fact of damages and uncertainty about the amount of damages").

According to the acceleration clause in the Agreement, upon termination by PCS, "all Fees that would have become payable had the Agreement remained in effect until expiration of the Term will become immediately due and payable."  (Docket Entry No. 62-1 § 2.7.4).  PCS invoked the acceleration clause when it terminated the Agreement, (Docket Entry No. 59-21), and now claims $1,437,426 in damages, (Docket Entry No. 59 at 19).

PCS is entitled to judgment as a matter of law on its claim that Dispatch breached the Agreement by failing to pay the third monthly installment of the Implementation Fee.  However, genuine disputes of material fact preclude summary judgment as to whether Dispatch breached the Agreement by failing to pay the Subscription Fee.  The unresolved liability issues—including whether the Subscription Fee became or would have become due—may affect the calculation of damages.  Accordingly, the court will defer consideration of the amount of damages until after the remaining liability issues have been resolved at trial.

## IV.    Conclusion

PCS has proved, as a matter of law, that Dispatch breached the Agreement by failing to pay the third monthly installment of the Implementation Fee.  The court grants summary judgment

to PCS on that issue.

Genuine disputes of material fact preclude summary judgment as to whether Dispatch breached the Agreement by failing to pay at least some of the Subscription Fee.  The court denies summary judgment on that issue.

The court defers consideration of the amount of damages until after a jury determines whether Dispatch's failure to pay the Subscription Fees constituted a breach of the Agreement.

SIGNED on January 28, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge