United States District Court
Southern District of Texas
**ENTERED**
August 19, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PCS SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 23-108 |
| | § | |
| DISPATCH SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION ENTERING
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Dispatch Services, Inc., a trucking management company, entered into a 36-month "Software as a Service Agreement" with PCS Software, Inc. for transportation management software. PX 1.[1] The Agreement called for PCS to provide software and support work for 36 months, at a cost to Dispatch of $39,000 per month (the "Subscription Fee"). *Id.* at 18. The Agreement also called for Dispatch to pay an "Implementation Fee" of $108,639 in six monthly installments. *Id.* at 18–19. Half of the Implementation Fee was due "starting on Product implementation commences [sic]" and "payable in 3 monthly installments of $18,106.33." *Id.* at 19. The other half was "due and payable at go live, and will be billed in 3 monthly installments of $18,106.33 upon the earlier of (a) [Dispatch's] first production use of any Products or (b) sixty (60) days after the Product implementation commences." *Id.*

PCS contends that after it provided the software and services, Dispatch made some payments but stopped paying after a few months, far short of the amounts due. PCS sued Dispatch for breach of contract and, alternatively, quantum meruit. (Docket Entry Nos. 1, 6). Dispatch

---

[1] PCS's exhibits are referred to as "PX" and filed at Docket Entry Number 132. Dispatch's exhibits are referred to as "DX" and filed at Docket Entry Numbers 117 to 129.

answered and counterclaimed for fraudulent inducement and related causes of action. (Docket Entry Nos. 16, 28, 49). Dispatch's counterclaims have been dismissed. (Docket Entry Nos. 47, 54, 85). The court granted partial summary judgment to PCS, holding that Dispatch breached by failing to pay part of the Implementation Fee but that factual disputes material to determining whether Dispatch breached by failing to pay the Subscription Fee precluded summary judgment on that issue. (Docket Entry No. 87).

The court held a three-day bench trial on: (1) whether Dispatch breached the Agreement by failing to pay the Subscription Fee; and (2) the amount of damages, including whether the contract damages clause is enforceable. The witnesses were Alan Shaw, PCS's chief customer officer; Mahdi Eslamimehr, PCS's expert; Jacob Hoover, Dispatch's director of operations; and Richard Gehse, Dispatch's expert. PCS also presented video clips from the deposition of Bruce Meighan, PCS's former vice president of sales for the east region. Both sides submitted documents that the court admitted into evidence.

Based on the pleadings, briefs, exhibits, testimony, arguments of counsel, and applicable law, the court finds and concludes as follows:

- Dispatch materially breached the Software as a Service Agreement by failing to pay the September, October, and November Subscription Fees.

- Dispatch materially breached the Software as a Service Agreement by failing to pay the third installment of the Implementation Fee.

- Section 2.7.4 of the Software as a Service Agreement is enforceable and provides just compensation for PCS's actual losses.

- PCS is entitled to recover $1,437,426 in damages.

PCS must submit a proposed final judgment, consistent with the court's findings and conclusions, no later than August 25, 2025.  PCS may submit its attorneys' fee application in accordance with Rule 54 of the Federal Rules of Civil Procedure, no later than September 10, 2025.

The court's detailed findings of fact and conclusions of law are set out below.[2]

## I.   Findings of Fact

### A.   The Agreement and Dispatch's Failure to Pay

Dispatch is a "third-party transportation consulting and management firm" that "connect[s] . . . clients with truck owner-operators" and "manage[s] the transportation of freight across the United States and Canada."  (Docket Entry No. 131 at 4); (Docket Entry No. 94 at 4). Dispatch relies on "transportation management software," which is the type of software that PCS offers.  (Docket Entry No. 94 at 2, 4).

Dispatch and PCS executed a "Software as a Service Agreement" on June 6, 2022.  PX 1. PCS agreed to provide transportation management software and related services to Dispatch.  *Id.* Dispatch chose PCS's "diamond package"—the top-tier subscription package— that included all the capabilities and functionalities offered in the platform, access for up to 599 users, unlimited access to all available partner integrations, and a higher level of support and implementation training assistance than the other subscription levels.  *Id.* at 19; Tr. (Day 1) at 20, 143.[3]  The Agreement required two categories of payment from Dispatch to PCS: the Implementation Fee and the Subscription Fee.  PX 1 at 18–19.

---

[2]  Any findings of fact that are more properly conclusions of law are so deemed.  Any conclusions of law that are more properly findings of fact are so deemed.

[3]  A real-time unedited trial transcript has been filed on the docket with this opinion.

The total Implementation Fee was $108,639, payable in six monthly installments. *Id.* Half of the Implementation Fee was due "starting on Product implementation commences [sic]" and "payable in 3 monthly installments of $18,106.33." *Id.* at 19. The other half was "due and payable at go live, and will be billed in 3 monthly installments of $18,106.33 upon the earlier of (a) [Dispatch's] first production use of any Products or (b) sixty (60) days after the Product implementation commences." *Id.*

Dispatch paid the first and second monthly installments of the Implementation Fee. (Docket Entry No. 94 at 4); PX 6; PX 7; PX 8; PX 9. This court has already held that Dispatch materially breached the Agreement by failing to pay the third monthly installment of the Implementation Fee. (Docket Entry No. 87 at 7). Because the parties agree that the software never went live, the second half of the Implementation Fee never became due. (*Id.* at 8).

The Subscription Fee was $39,000 per month. PX 1 at 18.[4] The "Initial Term" of the subscription was three years, starting on the date of Dispatch's "initial use of the Service." *Id.* § 2.1. The Agreement stated that Dispatch would be billed monthly for the Subscription Fee "[c]ommencing upon [Dispatch's] initial use of the Service." *Id.* § 3.1. "Service" is defined as "the Software as a Service application." *Id.* § 1.1. The Agreement does not define "initial use."

Dispatch was clearly informed that it would have to pay the Subscription Fees during implementation, before the software went live. On April 27, 2022, Dmytro Artyshuk, who assisted

---

[4] The Agreement stated that $39,000 would be due for Month 1; $0.00 would be due for Months 2 and 3; $40,147.06 would be due for Months 4 through 35; and $40,147.12 would be due for Month 36. PX 1 at 18. Shaw testified that Dispatch and PCS agreed to spread the Subscription Fee for Months 2 and 3 over the remaining months so that Dispatch did not have to pay for two transportation management software systems while it made the transition from one system to the PCS system. Tr. (Day 1) at 30–31, 71. Hoover testified that PCS offered that payment plan without Dispatch having to request it. *Id.* at 151.

Dispatch with obtaining and implementing PCS's software,[5] emailed Bruce Meighan, PCS's vice president of sales for the east region, asking whether Dispatch would "have to pay the monthly fee during implementation." PX 3 at 2. Meighan responded:

> **You will be invoiced monthly once the agreement is signed.** PCS has committed monthly costs for the 36 month term plus Carolina will be using the software immediately for configuration, data entry like trucks, locations, customers, etc and you will be training on the software. The implementation will go as quickly as Carolina can respond to the tasks that will be assigned. PCS is known for rapid go lives.

*Id.* (emphasis added).[6] Artyshuk forwarded the email to Hoover, Dispatch's director of operations. *Id.* at 1.

When questioned about the email at trial, Hoover acknowledged that "[i]t appears [the email] was sent to [him] at some point in time" but testified that he "[doesn't] recall reading this line of questioning specifically." Tr. (Day 1) at 163. Hoover argued that it was not clear whether Meighan's reference to "monthly" invoices referred to the Subscription Fee or the Implementation Fee. *Id.* That argument is belied by other record evidence and is not credible. Although the Implementation Fee was broken into equal installments over six months, the Agreement referred to the Subscription Fee as the "Monthly Subscription." PX 1 at 18. The Agreement presented the Subscription Fee amounts in a "Monthly Recurring Payment Schedule Invoiced Monthly," which

---

[5] *See* Tr. (Day 1) at 135–36 (Hoover testified that Artyshuk was "engaged," not "hired," by Dispatch because of his software experience and was paid for his services).

[6] There is evidence that, in the spring of 2022, PCS began conversations with Carolina Logistic, Inc. about a contract for transportation management software. Tr. (Day 1) at 23; PX 44. Carolina Logistic is a customer of Dispatch. Tr. (Day 1) at 24, 137. PCS's understanding was that Dispatch was the parent company of Carolina Logistic. *Id.* at 24; PX 2. Shaw testified that before the Agreement was signed, "the contract's signatory changed from Carolina Logistic to Dispatch & Services." Tr. (Day 1) at 24, 26–27; *see also* PX 2 (a May 2022 email from Meighan listed edits to the "subscription agreement," including changing "the name of their company from Carolina Logistics to their parent company, Dispatch Services, Inc."). Hoover testified that the contract was not originally between Carolina Logistic and PCS, and that "Dispatch was always the customer." Tr. (Day 1) at 149, 173. There is no dispute that Dispatch and PCS are the parties to the Agreement. *See* PX 1.

5

did not include the Implementation Fee.  *Id.*  Hoover himself distinguished between the "monthly invoice" and "implementation fee" when sending PCS the first Subscription Fee payment and the first installment of the Implementation Fee.  PX 13 at 1–2.

The parties agree that "Dispatch paid the first month's Subscription Fee in the amount of $39,000, by check dated June 29, 2022."  (Docket Entry No. 94 at 4).  PCS sent the invoice for the first month's Subscription Fee to Dispatch on June 15, 2022.  DX 82; PX 4 (Invoice Number 10173215).  Dispatch paid that invoice by check dated June 29, 2022.  PX 5 (Check for Invoice Number 10173215).  Dispatch paid the invoice for the first monthly installment of the Implementation Fee by a different check issued on the same date.  PX 6 (Invoice Number 10173219); PX 7 (Check for Invoice Number 10173219).

PCS sent Dispatch an invoice for the second monthly installment of the Implementation Fee, with a due date of July 13, 2022.  PX 8 (Invoice Number 10173978).  Dispatch paid that invoice by check dated July 13, 2022.  PX 9 (Check for Invoice Number 10173978).[7]  Dispatch made two Implementation Fee payments and one Subscription Fee payment to PCS, totaling $75,213.  (Docket Entry No. 94 at 4).

Dispatch did not pay any other invoices that PCS sent.  (*Id.*).  Dispatch did not notify PCS that it would no longer pay its invoices.  (*Id.*).  Dispatch did not terminate the Agreement according to its terms; instead, Dispatch simply stopped paying, and then stopped communicating with anyone at PCS.  *See* (*id.*); Tr. (Day 1) at 80–81; PX 16.

PCS sent multiple emails to Dispatch stating that the invoices were overdue.  *See, e.g.*, PX 11; PX 12; PX 24.  Hoover is listed as a recipient on these emails.  He forwarded one to another

---

[7] Although the check was dated July 13, 2022, PCS did not receive it until September 2022.  Tr. (Day 1) at 70; *see also* PX 29.

6

Dispatch employee on October 13, 2022. PX 24, 48. Yet Hoover told PCS on October 26, 2022, that he "wasn't aware" that Dispatch was behind on its payments. PX 49. At trial, even after viewing these emails, Hoover testified that he was "[n]ot necessarily" aware on October 26, 2022, that Dispatch was behind on its payments. Tr. (Day 1) at 213. When asked by the court how that could be true given the multiple emails sent to him—one of which he forwarded—stating that Dispatch was behind on payments, Hoover testified: "I don't know if I had read them or seen them." *Id.* at 215. He testified that the accounting department at Dispatch "doesn't necessarily have to tell [him] everything that they're doing." *Id.* Hoover also testified that he was getting a lot of emails in October 2022, and that his wife was then eight months pregnant. *Id.* at 270. Hoover was on parental leave starting on November 17, 2022, for approximately two months. *Id.* at 245–46. Despite Hoover's inability to remember whether he received these emails, he nonetheless had very detailed recollections of other communications and meetings with PCS that occurred right before his parental leave began. *See, e.g.*, *id.* at 258–59. Hoover's selective memory is another sign of his lack of credibility.

On November 18, 2022, Meighan sent Hoover an email stating that Dispatch must "bring its account current by 5 pm Tuesday [November 22] or service will be suspended." PX 12. Shaw testified that PCS did not receive a response to that email. Tr. (Day 1) at 81. Dispatch did not pay the outstanding invoices. *See* (Docket Entry No. 94 at 4). PCS suspended Dispatch's service on November 22, 2022. Tr. (Day 1) at 81.

PCS terminated the Agreement according to its terms by a December 19, 2022, letter. PX 16. The letter stated that "PCS has not received any communications from Dispatch since November 14, 2022." *Id.* at 2. As the basis for termination, the letter cited Sections 2.3 and 2.5 of the Agreement:

**2.3** PCS may terminate this Agreement, effective on written notice to [Dispatch], if [Dispatch] (a) fails to pay any amount when due hereunder, and such failure continues more than three (3) days after [Dispatch's] delivery of written notice thereof; or (b) breaches any of its obligations under Sections 4.8, 9 or 12.

. . .

**2.5** Either Party may terminate this Agreement, effective on written notice to the other party, if the other party materially breaches this Agreement, and such breach: (a) is incapable of cure; or (b) being capable of cure, remains uncured thirty (30) days after the non-breaching Party provides the breaching Party with written notice of such breach.

PX 1 §§ 2.3, 2.5; PX 16 at 2.  The letter also cited Section 2.7.4 of the Agreement, which states:

[E]xcept with regards to PCS' termination pursuant to Section 2.4 or [Dispatch's] termination pursuant to Section 2.5, all Fees that would have become payable had the Agreement remained in effect until expiration of the Term will become immediately due and payable, and [Dispatch] shall pay such Fees, together with all previously accrued but not yet paid Fees, promptly upon receipt of PCS' invoice therefor.

PX 1 § 2.7.4; PX 16 at 2.  PCS demanded that Dispatch pay the balance of its outstanding invoices for August 2022 through November 2022 ($160,303.02), as well as "the Monthly Subscription Fees over the next 30 remaining months and all Implementation Fees" ($1,277,122.98), for a total of $1,437,426.00.  PX 16 at 2.  PCS never received a response to the demand letter.  Tr. (Day 1) at 83.

On January 23, 2023, Dispatch was served with this lawsuit.  (Docket Entry No. 9) (service executed at 1:45 PM).  Later that night, Hoover emailed Shaw, stating that he had returned from parental leave and "learned communication [with PCS] had essentially stopped and was left surrounding some past due invoices and conversations regarding some . . . system challenges." (PX 14) (sent at 8:18 PM).  Hoover testified that he did not know about the lawsuit when he sent that email and that the timing was coincidental.  Tr. (Day 1) at 234.

8

The parties agree that implementation of PCS's software for Dispatch began in June 2022 and continued until November 2022. (Docket Entry No. 94 at 4). During that time, the software never reached "go-live." *See* (Docket Entry No. 87 at 8). The parties disagree about whether Dispatch's "initial use" under Sections 2.1 and 3.1 of the Agreement occurred. If "initial use" never occurred, then Dispatch never owed the Subscription Fee. *See* PX 1 §§ 2.1, 3.1. If "initial use" did occur, Dispatch breached by failing to pay the Subscription Fee.

### B.     The Implementation Activities

Shaw testified about the activities taken between June 2022 and November 2022 to get ready for go-live. Most of his testimony as to those activities was uncontroverted.

The parties signed the Agreement on June 6, 2022.[8] PCS provided Dispatch access to the software on June 6, 2022, and the first Dispatch user logged into the PCS software on June 10, 2022. Tr. (Day 1) at 113–15, 268–69. On June 14, 2022, there was a "PCS-Dispatch and Service Implementation Kickoff Call" that both Shaw and Hoover attended. PX 40. PCS's first invoices for the Subscription Fee and Implementation Fee were dated June 6, 2022, and June 13, 2022, respectively, and sent to Dispatch on June 15, 2022. DX 82.

A number of Dispatch users were provided login credentials to the PCS software. PCS submitted "Weekly Login Count" data showing the number of individual Dispatch users who logged into the PCS software in a given week. PX 15 at 1; *see also* Tr. (Day 1) at 59–60. The first login was during the week of June 6, 2022. PX 15 at 1. The weekly logins increased over the following 14 weeks, peaking at 76 logins during the week of October 31, 2022. *Id.* The last week

---

[8] Dispatch's counterclaims challenging the formation of the contract have been dismissed. (Docket Entry Nos. 47, 54, 85). The court will not address the evidence related to the negotiation period that was presented at trial but is not necessary to resolve the remaining issues.

for which data was provided is the week of November 21, 2022, when four Dispatch users logged in. *Id.*

PCS also submitted "Weekly Load Count" data. *Id.* at 2. A "load" is the freight or cargo that a Dispatch customer moves from one location to another. Tr. (Day 1) at 25. Shaw testified that loads are "the currency for a trucking company" and "the way that they generate revenue and profits." *Id.* The "Weekly Load Count" data shows the number of loads that Dispatch users entered into the PCS software from the week of September 12, 2022, to the week of December 5, 2022. PX 15 at 2. The "Weekly Load Count" data generally matches the trajectory of the "Weekly Login Count" data, peaking in early November 2022. *Id.* at 1–2.

The parties dispute whether Dispatch entered any "live loads" into PCS's software, or whether the "Weekly Load Count" data showed only "dummy loads" or "historical loads." A "live load" represents real-time commercial transactions. Tr. (Day 1) at 258. A "dummy load" is "made up information" that is used to test the system. *Id.* at 256. A "historical load" represents a load that occurred in the past. *Id.* at 117–18. Hoover testified that the "Weekly Load Count" data was either "dummy loads or historical loads," and that he was "[a] hundred percent certain they were not live loads." *Id.* at 257. Shaw testified that he could not tell from the data whether the "Weekly Load Count" included live loads. *Id.* at 64.

Shaw testified about the steps that must take place before a customer is ready to "go live." *See, e.g.*, *id.* at 31–32, 91–92. The steps include configuring the system and software to fit a customer's needs, uploading data, training, integrating, and testing. *Id.* Shaw testified that PCS and Dispatch performed all these steps during the implementation phase. *See, e.g.*, *id.* at 31–32, 41–42, 48–49, 91–92, 112–13.

10

PCS made two site visits to Dispatch's office in North Carolina to implement the software. *Id.* at 41. The first site visit, in June 2022, was essentially planning for implementation. *Id.* at 41, 44; *see* DX 48. Shaw testified that at the June 2022 site visit, PCS and Dispatch were "trying to go through the software screen by screen, feature by feature" together to "identify [Dispatch's] requirements and any gaps in the software." Tr. (Day 1) at 44. The second visit, on November 7 and 8, 2022, was intended to provide onsite support for Dispatch to "go live" on the PCS software. *Id.* at 62.

In between the site visits, around August and September 2022, PCS provided online training to Dispatch's "super users," a shorthand term for the "initial set-up people that are going to get trained on the platform, . . . become the experts in all things PCS[,] and then go train the rest of their teams." *Id.* at 48–49; DX 98. Each "super user" had PCS's application installed on his or her computer and completed online on-demand training "to help familiarize them with [PCS's] platform" and "learn the basics of [PCS's] software." Tr. (Day 1) at 48–49. Shaw testified that approximately 55 "super users," mostly Dispatch employees, completed the training. *Id.* at 49–50. The training activities and timeline are consistent with the "Weekly Login Count" data, which shows the Dispatch logins ramping up at the end of August, staying relatively constant through October, and then increasing significantly during the first and second weeks of November. *Id.* at 61–62; PX 15 at 1.

During implementation, Dispatch reported issues with the software to PCS representatives, who communicated those concerns internally at PCS through support tickets or engineering tickets. *See* DX 8; Tr. (Day 1) at 50–51, 101. Shaw testified that the description on each ticket was "written by a PCS employee with the voice of the end user from Dispatch & Services to describe what

they're trying to do in the platform." Tr. (Day 1) at 101. A ticket on "Mobile Express Messaging" created on October 17, 2022, included the following description:

> As a Driver when I respond back to a Dispatcher1's message, it sends it multiple times to Dipsatcher1 [*sic*] as well as all other Dispatch users. It appears that the duplicated messages are sent to each TMS user marked as a "Dispatcher" as well as to Dispatcher1. Please review screenshots.
>
> It should just send one message in response to Dispatcher1 and all other Dispatchers in the TMS should receive the message and should be able to respond back to it as needed.

DX 8 at 8. Shaw explained that this description was written by a PCS employee based on "feedback submitted by Dispatch & Services." Tr. (Day 1) at 102. The tickets are evidence that Dispatch was using PCS's software and providing feedback to PCS during the implementation period.

Dispatch wanted a transportation management software that could handle approximately 40 customer databases. *Id.* at 108–09, 130, 139; *see also* DX 11 at 2. Hoover testified that Dispatch never obtained software from PCS with that capability. *See* Tr. (Day 1) at 248–49. Shaw testified that PCS's software could only handle 20 to 25 databases when the parties signed the Agreement, but that PCS had a plan to expand that capacity to accommodate all of Dispatch's customer databases before Dispatch went live with the PCS software. *Id.* at 109–10; *see also* DX 11 at 2 (a July 2022 email from a PCS engineer to other PCS employees stated that PCS's software "out of the box . . . can only do up to 26 databases" and that PCS is "having to make some changes" so that the software can accommodate Dispatch's "40+ databases"). According to Shaw, by October 2022, PCS's software could accommodate more than 40 databases. Tr (Day 1) at 110, 130. Shaw testified that PCS demonstrated that capability to Hoover in early October 2022. *Id.* at 130. On October 31, 2022, PCS announced to all its customers, not just Dispatch, that its

software was now capable of servicing an unlimited number of customer databases.  *Id.* at 122–23; DX 131.

About a week after that announcement, two PCS employees went to North Carolina for a second site visit at Dispatch's office.  Tr. (Day 1) at 41, 62.  Shaw testified that the November site visit was intended "to support what [PCS] expected to be [Dispatch's] go-live of the software." *Id.* at 75.  Instead, when the PCS team arrived, Dispatch told them that it was "experiencing issues with the software" and "can't go live."  *Id.* at 75–76.  According to Shaw, Dispatch raised several new issues with the software at the site visit, issues that had not been discussed with PCS previously.  *Id.* at 76.

Shaw testified that PCS responded to Dispatch's concerns "aggressively."  *Id.* at 75.  Shaw, Hoover, and others had a call on November 14, 2022, to discuss the issues raised at the site visit. *Id.* at 76; *see also* PX 19.  Shaw followed up over email summarizing "the key items discussed on this morning's call," listing ten "areas of concern" raised by Dispatch, and outlining a plan to address the outstanding issues.  PX 19.  Shaw testified that most of the concerns were relatively easy fixes and would not prevent Dispatch from going live.  Tr. (Day 3) at 33–36.

Like the support tickets, Shaw's descriptions of Dispatch's concerns indicate that Dispatch was using PCS's software.  The list included: "Check Call / Arrival Delays – delay for check calls and driver arrivals to show in system log, takes up to 5 minutes to update."  PX 19 at 2.  Hoover testified that he agreed with Shaw's characterization of the "Check Call" issue.  Tr. (Day 1) at 226. According to Hoover, a check call provides an update on a driver's location, generally at pickup and delivery, "but it can happen in transition."  *Id.*  Hoover testified that a check call happens in real time and represents a driver currently—not historically—on the road.  *Id.* at 227.  Hoover testified that the "Check Call / Arrival Delays" item in Shaw's email does "not necessarily"

indicate that Dispatch was using the software because "using the system for me is being able to accurately use the system for operations." *Id.* But Hoover could not explain how Dispatch could have identified the five-minute delay in check calls if it was not using the software in real time. *Id.* at 228.

Shaw's November 14, 2022, email also stated that PCS had "a few other items in development for Dispatch & Services" and asked for Dispatch's "prioritized ranking" of those items so that PCS "can make sure that [it is] focused on the most critical items first." PX 19 at 2. Those items overlapped with the ten "areas of concern" listed in the same email. *Id.* at 2–3. Hoover responded to Shaw's email, stating "[w]e will sit down and get things prioritized in the morning and sent back over." *Id.* at 1. Hoover went on parental leave a few days later. Tr. (Day 1) at 245–46. Shaw testified, without rebuttal, that PCS did not hear anything else from Dispatch until after filing this lawsuit. *Id.* at 79.

To summarize: there is a lot of evidence—mostly unrebutted—that Dispatch used PCS's software between June 2022 and November 2022. The first Dispatch login was four days after the Agreement was executed. Tr. (Day 1) at 113–14. Shaw testified about the actions PCS took to implement the software and configure it to Dispatch's needs, including responding to Dispatch's reports about problems it encountered in using the software. The implementation and configuration required Dispatch to use the software. Dispatch could not have reported the issues it encountered with the software if it was not using the software. Similarly, Dispatch could not have identified the issue with check calls if it was not using the software for live data, in real time. Hoover's testimony shows that Dispatch was frustrated with some aspects of how the PCS software worked, not that Dispatch did not use the software. The evidence shows that PCS was taking steps to fix the issues Dispatch identified in November 2022, even while Dispatch was

months behind on payment.  After November 14, 2022, Dispatch stopped communicating with PCS until this lawsuit was filed.

Hoover could not answer questions about configuring the software, setting up the software, or the "IT side."  *Id.* at 174–75.  PCS's counsel responded that he would save questions related to those issues for Artyshuk, who was engaged by Dispatch to provide software and IT expertise related to the acquisition and implementation of PCS's software.  *Id.*; *see also id.* at 135–36.  After Hoover's testimony, Dispatch's counsel announced that it was "no longer calling Dmytro Artyshuk" as a witness.  Tr. (Day 2) at 1.  The result was that Dispatch had no evidence rebutting much of Shaw's testimony.  To the extent that Hoover's testimony contradicted Shaw's, Shaw was much more credible.  Hoover consistently and unrealistically hedged his answers even in the face of clear documentary evidence, including emails that he wrote, which undermined his credibility.  *See, e.g.*, Tr. (Day 1) at 220 (Hoover testified that if he responded to an email, he "most likely" received that email.).  Hoover's major lapses in memory on issues potentially harmful to Dispatch, in contrast with his remarkable recall on issues that helped Dispatch, also causes the court to find that his testimony was not credible.

## C.    The Expert Testimony on "Initial Use"

This court allowed both sides to present expert testimony on the specialized technical meaning of "initial use" in the software industry.  *See* (Docket Entry No. 56).

PCS's expert, Mahdi Eslamimehr, is the executive vice president at Quandary Peak Research and an adjunct professor of computer science at the University of Southern California. Tr. (Day 2) at 28.  His experience includes leading a team of approximately 150 engineers building Software as a Service solutions for clients around the world.  *Id.* at 29.  He has also been part of business teams reviewing, purchasing, and selling Software as a Service products, as well as

15

deploying Software as a Service applications for clients. *Id.* at 31. He has previously served as an expert in software-related cases. *Id.* at 32. In short, he epitomizes the brilliant software innovators who are heavily represented on the West Coast.

Eslamimehr testified that "initial use" and "go live" are two different points in the software development cycle. *Id.* at 46. He defined "go live" as the point at which the software is ready to be deployed in a commercial environment, when it should be "pretty much bulletproof." *Id.* He testified that "initial use" is the preparation to "go live": "you release your software . . . in a very limited or controlled environment" to "check if the software is bug free," "fix those little issues," and "validate the client's performance." *Id.* Once the issues are fixed, according to Eslamimehr, the software can "go live." *Id.* at 46–47. He testified that, while possible, it would be a "fiasco" to "go live" before "initial use," akin to driving with your eyes closed. *Id.* at 89–90.

Eslamimehr testified that "initial use" includes implementation; data migration; training those who will use the software; uploading data—including fake or historical loads—to test the software; logging into and interacting with the software; and configuring the software to a specific environment. *See, e.g.*, *id.* at 54–58, 62–63. He testified that Dispatch's use of PCS's software for dummy loads fit the "definition of initial use." *Id.* at 62. Dispatch's multiple logins and uploads to the PCS software also indicated to Eslamimehr that Dispatch had "initially used" the PCS software. *Id.* at 63.

Eslamimehr's conclusions were based on his experience with and research into the Software as a Service industry. *Id.* at 44. He defined Software as a Service as "a software which is provided to the client in the form of as a service." *Id.* at 37. According to Eslamimehr, customers purchasing Software as a Service generally pay a subscription fee in installments, instead of a one-time fee. *Id.* While purchasing a software product is often done through a one-time payment,

Software as a Service is generally purchased through installment payments, reflecting the purchase of ongoing support, installation, and assistance from the software provider. *See id.* at 37–38. That definition is consistent with the ongoing work PCS did to provide its software to Dispatch and then provide ongoing support and assistance to Dispatch.

Dispatch's expert witness, Richard Gehse, is the practice leader of the industrial group at Rimkus Consulting, a company offering forensic engineering services for insurance disputes and litigations involving a wide range of subjects, not focused on software design, marketing, or use. *Id.* at 134. He has been involved in several software cases at Rimkus. *Id.* Gehse previously worked at several companies developing and implementing software and Software as a Service. *Id.* at 134–37.

Gehse agreed with Eslamimehr that customers must pay a subscription fee to access Software as a Service. *Id.* at 137–38. He added that a Software as a Service vendor can enter an agreement with a customer to provide the "base model plus all the modifications" that the customer may request to "customize [the software] to suit what it is the customer wants it to be." *Id.* at 138.

Gehse and Eslamimehr agreed that a customer's testing of a newly purchased software program should take place before "go live." *Id.* at 89–90, 139–41. Eslamimehr testified that a customer testing a software program before deploying it in the customer's business operations is "using" the software. *Id.* at 56. Gehse acknowledged that Dispatch "used" PCS's software when testing it. *Id.* at 155 ("[Y]ou can't test without using the software."); *id.* at 157. But Gehse then testified that Dispatch did not "initially use" the PCS software because Dispatch did not successfully use the software in its commercial operation (its intended use). *Id.* at 172–73, 227. Gehse testified that when testing the software using historical loads, "you're using the software, but you're in testing mode," which is not "initial use." *Id.* at 156–57. He testified that whether

17

testing software is using software depends on whether the test is successful; "a successful run all the way through" is initial use. *Id.* at 171, 215–16.  In Gehse's opinion, "initial use" never occurred because Dispatch never successfully used the software "for its intended purpose." *See, e.g.*, *id.* at 172–73.

Gehse testified that "initial use" has a specialized meaning in the Software as a Service context: "It means that you are using it in a production environment, which infers that it's gone live, that you are now using it." *Id.* at 139.  According to Gehse, the "normal industry trade practice for the phrase 'initial use' is when software is first used in a commercial environment." *Id.* at 207–08.

In contrast to "initial use," Gehse defined "go live" as the point when users "will be able to log in and start using the software." *Id.* at 140.  Gehse testified: "Under most, if not all, of these [Software as a Service] applications that I've done, . . . there are two servers.  One's production; one is test." *Id.* at 196.  In his experience, data migration, merging databases, testing, and validation are all completed before go-live. *Id.*; *see also id.* at 140–41.  After that, "you push it to the production server, flip the switch and you go-live." *Id.* at 196–97.  He repeatedly analogized "go live" to "flip[ping] the switch." *Id.* at 140, 196, 216, 223.  He distinguished testing, which happens after implementation but before "go-live," from "initial use," which happens at "go-live" or moments after. *Id.* at 143–47.  He testified that none of the steps before "go-live" are "initial use." *Id.* at 146–47.

On rebuttal, Shaw criticized Gehse for fundamentally misunderstanding PCS's software development life cycle, engineering practices, and implementation processes.  Tr. (Day 3) at 2–7.  Shaw testified that Gehse was describing a "custom application development model," which is "not what PCS sells or what we do." *Id.* at 3.  PCS's software is "multi-tenant," meaning PCS has

18

"one software application" and "one set of code that's used for every single one of PCS's customers." *Id.* Each customer gets "one environment" that they can log into and access immediately when they purchase the product. *Id.* at 5. PCS then "configure[s] that environment for the customer," including loading the customer's data, setting up databases, and customizing settings to fit the customer's needs. *Id.* at 5–7. That configuration process does not include developing new code for each customer. *Id.* at 4, 6–7. PCS does not use a two-server system, which is the model that Gehse based his testimony on.

Gehse's testimony lacked relevant expertise and knowledge. His focus on a two-server system, which is not the software that PCS provided to Dispatch, was a major flaw in his testimony. He eventually acknowledged that the "flipping the switch" analogy may not apply to the Software as a Service that PCS provided to Dispatch. Tr. (Day 2) at 216. Gehse's report stated that PCS provided Dispatch with a "full production environment." *Id.* at 191–92, 193–94. After reading Eslamimehr's report, Gehse wrongly assumed that two servers were involved. *Id.* at 194. When asked why he made that assumption, he testified it was because "that's how you do these types of projects. You don't just have one box. I mean, holy smokes, I mean who would do that?" *Id.* Gehse learned during the trial that his assumptions were wrong and his knowledge outdated. Gehse acknowledged that, "[n]ow that I'm aware that it's only one box, then everything is like up in the air." *Id.* at 192.

Gehse's unfamiliarity with PCS's software and practices made much of his other testimony confusing, unreliable, and inapplicable to the facts of this case. For example, he testified that logging into a testing server is not "initial use," but logging into the production server is "initial use." *Id.* at 153; *see also id.* at 146 ("[I]nitial use on the test server is not initial use."). That distinction simply does not apply to the system PCS provided to Dispatch. Similarly, Gehse's

distinction between "use for testing" and "use for live loads" was linked to his two-server assumption. For example, when asked about the difference between "testing" and "use," Gehse replied:

> The distinction is when you are -- you can't test without using the software, okay? What I'm saying is the software you're using is the test version, the beta version, that you have to test to make sure it's got your functionality, okay?

*Id.* at 155. Gehse did not explain how the "test version" or "beta version" analysis would apply to the implementation, configuration, and testing completed before "go-live" on the full production environment that PCS provided Dispatch. Gehse displayed a lack of knowledge about more current software systems in general, and PCS's system in particular, that undermined the reliability and applicability of his testimony.

## II.    Conclusions of Law

### A.    Breach

Under Texas law, the elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting reference omitted). On summary judgment, the court held that Dispatch breached the Agreement by failing to pay the third installment of the Implementation Fee. (Docket Entry No. 87 at 7). Because the software never went live, the second half of the Implementation Fee never became due, so Dispatch did not breach the Agreement by failing to pay the second half of the Implementation Fee. (*Id.* at 8). The issue is whether Dispatch breached the Agreement by failing to pay the monthly Subscription Fees after June of 2022.

The parties agree that the Agreement is unambiguous. (Docket Entry No. 94 at 5). "If a contract is unambiguous, [courts] apply its plain meaning and enforce it as written." *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012). But "[e]ven if a contract is unambiguous as a matter of law, a court may still consider the surrounding facts and circumstances as an aid in the construction of the contract's language." *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 234–35 (5th Cir. 2022) (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019)). "When 'construing a specific contractual term, [courts] must give consideration to the meaning attributed to that term in the industry.'" *Id.* at 235 (quoting *Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000)).

The court rejects Dispatch's argument that "initial use" means successful commercial use, or successful use for an intended purpose. The Agreement does not say "commercial use," "full commercial use," or "use for an intended purpose." The Agreement discusses "production use" and "go live" in the context of Dispatch's obligation to begin paying the second half of the Implementation Fee. PX 1 at 19. The Agreement says that Dispatch's "initial use of the Service" triggers its obligation to begin paying the Subscription Fees. *Id.* § 3.1. The Agreement defines "Service" as "the Software as a Service application." *Id.* § 1.1. Both experts testified that "Software as a Service" is software that clients can access by paying a recurring subscription fee, instead of a one-time payment. Tr. (Day 2) at 37, 138. There was no evidence that "Software as a Service application," as used in Section 1.1 of the Agreement, referred to anything other than the transportation management software that PCS provided to Dispatch.

The Agreement means what it says: Dispatch was required to start paying the Subscription Fee once it first used PCS's transportation management software. PX 1 §§ 1.1, 3.1; *see also id.* § 2.1.

21

Industry practice supports this conclusion. PCS's expert—a researcher, businessman, and scientist with extensive experience in the Software as a Service industry—testified that "initial use" is the period of using the software—including implementing, configuring, validating, and testing it—to prepare to "go live." *See, e.g.*, Tr. (Day 2) at 46, 54–58, 62–63. The only contrary evidence was testimony from Dispatch's expert, who changed his opinions over the course of his testimony and fundamentally misunderstood PCS's software and business. The flaws in Gehse's testimony undermine his conclusion that "initial use" requires successful use in a commercial environment. Eslamimehr's experience, understanding of the facts of this case and the software system at issue here, and understanding of the Software as a Service industry as applied to the facts of this case make him the more credible and reliable expert.

Having rejected the conflation of "initial use" with "commercial use," this court easily concludes that Dispatch initially used PCS's software. Indeed, Dispatch's own attorneys could not help but describe Dispatch's activities as demonstrating "use." *See, e.g.*, (Docket Entry No. 109 at 38) ("[T]his new multi-database issue I think is what caused a lot of these other symptoms to arise when Dispatch was using it."). Dispatch used the software when it logged in, implemented the software, tested the software, trained "super users," configured the software, and migrated data into the software. The first of any one of those uses is "initial use."[9]

The evidence shows that Dispatch's "initial use" was on June 10, 2022, when the first Dispatch user logged into the PCS software. *See* Tr. (Day 1) at 90–91, 113–14, 269; PX 15 at 1; *see also* Tr. (Day 3) at 61, 71. From then on, Dispatch had the contractual obligation to pay the

---

[9] Although not necessary for "initial use" to occur, the court notes that Dispatch's report about issues with delays in check calls indicates that Dispatch used PCS's software for live loads. *See* PX 19; Tr. (Day 1) at 227–28.

Subscription Fee according to the Agreement's "Monthly Reoccurring Payment Schedule." *See* PX 1 § 3.1; *id.* at 18. Dispatch paid the June 2022 Subscription Fee. PX 5. There was no Subscription Fee for July or August. PX 1 at 18. Before PCS terminated the Agreement, it sent Dispatch invoices for the September, October, and November Subscription Fees. *See* PX 18.

Because Dispatch's "initial use" occurred in June 2022, Dispatch breached the Agreement by failing to pay the Subscription Fees starting in September 2022.

**B.    Damages**

PCS has proven every element of its breach of contract claim. There is no dispute that PCS suffered damages due to Dispatch's breach; the remaining issue is the amount of damages. *See Dyll v. Adams*, 167 F.3d 945, 947 (5th Cir. 1999) (Texas law distinguishes "between uncertainty about the fact of damages and uncertainty about the amount of damages.").

Section 2.7.4 of the Agreement states:

> [E]xcept with regards to PCS' termination pursuant to Section 2.4 or [Dispatch's] termination pursuant to Section 2.5, all Fees that would have become payable had the Agreement remained in effect until expiration of the Term will become immediately due and payable, and [Dispatch] shall pay such Fees, together with all previously accrued but not yet paid Fees, promptly upon receipt of PCS' invoice therefor.

PX 1 § 2.7.4. PCS asks the court to enforce Section 2.7.4 of the Agreement and award $1,437,426 to PCS in damages. Dispatch argues that Section 2.7.4 is an unenforceable liquidated damages clause.

**1.    The Waiver Issue**

PCS first argues that Dispatch did not timely raise its liquidated damages argument. An argument that a liquidated damages clause is an illegal and unenforceable penalty "is an affirmative defense that a defendant must raise in its responsive pleading in district court." *See NewCSI, Inc. v. Staffing 360 Sols., Inc.*, 865 F.3d 251, 259 (5th Cir. 2017); Fed. R. Civ. P. 8(c)(1). "Generally,

failure to comply with [Rule] 8(c) results in waiver of the . . . affirmative defense." *Lee v. United States*, 765 F.3d 521, 523–24 (5th Cir. 2014). "However, if 'a defendant raises the issue at a pragmatically sufficient time, and if the plaintiff is not prejudiced in its ability to respond, there is no waiver of the defense.'" *Id.* at 524 (quoting *Vanhoy v. United States*, 514 F.3d 447, 450 (5th Cir. 2008)).

Dispatch did not plead an affirmative defense that Section 2.7.4 is an unenforceable liquidated damages clause. *See* (Docket Entry Nos. 16, 28, 49). Dispatch did not raise the liquidated damages defense in its response to PCS's summary judgment motion. (Docket Entry No. 66). To the contrary, Dispatch's response stated, without caveat, that the Agreement is "a valid and binding contractual agreement . . . between PCS and Dispatch." (*Id.* at 4).

After discovery closed, the court allowed both sides to file a short supplement to the summary judgment briefing discussing the impact of new discovery. Dispatch raised its liquidated damages defense for the first time in its supplemental brief, filed after PCS's supplement. *See* (Docket Entry Nos. 78, 79). In the Joint Pretrial Order, Dispatch agreed that the Agreement "is valid and enforceable" but also argued that Section 2.7.4 is an unenforceable liquidated damages clause. (Docket Entry No. 94 at 3, 5). Although Dispatch concedes that the liquidated damages defense was not pleaded, Dispatch argues that PCS had sufficient notice of the defense because Dispatch raised it approximately four months before trial, argued it at the summary judgment hearing, and asserted it as a contested issue of law in the Joint Pretrial Order. (Docket Entry No. 135 at 14–15).

Because Dispatch failed to plead its liquidated damages defense and did not argue that Section 2.7.4 was unenforceable until after discovery closed, PCS missed the opportunity to seek other information related to actual damages, why PCS's business model makes damages difficult

24

to calculate under the Agreement, and why Section 2.7.4 was a reasonable forecast of just compensation at the time the Agreement was signed. A more developed factual record on those issues could have informed the court's analysis of whether the damages clause is enforceable. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (fact issues can be relevant to the question of whether a liquidated damages clause is enforceable). PCS did not have the opportunity to address liquidated damages on summary judgment because Dispatch did not raise the issue until after the summary judgment motion was fully briefed. Dispatch's arguably contradictory statements in the Joint Pretrial Order added to the confusion. Dispatch's belated presentation of its liquidated damages argument unfairly prejudiced PCS.

Dispatch violated Rule 8(c) by failing to plead its affirmative defense that Section 2.7.4 is an unenforceable liquidated damages clause. The belated assertion of the defense prejudiced PCS. Under Fifth Circuit case law, that means Dispatch waived its liquidated damages defense. *See Lee*, 765 F.3d at 523–24. Nevertheless, even absent waiver, Dispatch's argument that Section 2.7.4 is an unenforceable liquidated damages clause fails on the merits.

### 2.    The Enforceability of Section 2.7.4

In Texas, "[t]he universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Phillips*, 820 S.W.2d at 788 (quoting *Stewart v. Basey*, 245 S.W.2d 484, 485–86 (Tex. 1952)). The "normal measure" of damages in breach of contract cases "is the benefit of the bargain, which seeks to place the injured party in the economic position it would have been in had the contract been performed." *Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 217 (5th Cir. 2023) (quoting reference omitted). "The benefit of the bargain is measured by the prevailing party's anticipated receipts and losses caused by the

breach less any cost or other loss [it] has avoided by not having to perform." *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 889 (Tex. App.—Dallas 2004, pet. denied).

PCS is entitled to recover its benefit-of-the-bargain damages. *See Nat'l Oilwell Varco, L.P.*, 68 F.4th at 217; *see also* (Docket Entry No. 133 at 2–3). As detailed below, Section 2.7.4 closely tracks benefit-of-the-bargain damages, especially given Shaw's testimony that most of PCS's costs to customize and provide technical support for the software it provided Dispatch had already been expended by November 2022. Limiting PCS's recovery to the Subscription and Implementation Fees for the few months that Dispatch used the PCS software would not compensate PCS for its losses. Shaw also testified that PCS would have continued to provide the software and support services if the Agreement had not been terminated. Even though most of PCS's costs were frontloaded, PCS would have incurred additional expenses if the Agreement had not been terminated. Those expenses would have varied month-to-month. Because it is impossible to calculate what PCS would have spent providing software and services to Dispatch during the remaining 31 months of the contract period, the court cannot conclude that awarding PCS the remaining Subscription and Implementation Fees under Section 2.7.4 would "place [PCS] in the economic position it would have been in had the contract been performed." *See Nat'l Oilwell Varco, L.P.*, 68 F.4th at 217 (quoting reference omitted); *see also Qaddura*, 141 S.W.3d at 889. Perhaps that uncertainty is why the parties—two sophisticated companies—included Section 2.7.4 in the Agreement.

"Th[e] general measure of damages is subject to any agreement that the parties might have made with respect to damages because parties to a contract are free to limit or modify the remedies available in the event of a breach." *TODCO Americas, Inc. v. El Paso Oleo e Gas do Brasil, Ltda.*, No. CV H-08-1832, 2009 WL 10697535, at *4 (S.D. Tex. July 17, 2009). "Texas favors freedom

of contract, as a policy firmly embedded in [its] jurisprudence." *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) (quotation marks and quoting reference omitted); *see also Crossmark, Inc. v. Hazar*, 124 S.W.3d 422, 435 (Tex. App.—Dallas 2004, pet. denied) ("The general rule in Texas is that parties are bound by their agreed-to measure of damages for a breach of contract."). Nonetheless, Texas law places some limits on contracted-for damages in the interest of public policy. *See, e.g., Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 645 (5th Cir. 1991) (Texas follows the reasons given in the *Restatement (Second) of Contracts* for invalidating contractual damages clauses that punish, rather than compensate, the non-breaching party.); *Crossmark, Inc.*, 124 S.W.3d at 435–36 (enforcing "acceleration clauses [that] do not contain unlawful penalties and do not violate public policy").

Some contracts contain damages provisions that allow a non-breaching party to accelerate all money owed under the contract in the event of a breach. *See, e.g., Crossmark, Inc.*, 124 S.W.3d at 427, 435–36. These "acceleration clauses" are unenforceable if they "require[] unearned interest to be collected." *Id.* at 435. Contract damages provisions that "merely accelerate the payments due" are enforceable and do not violate public policy. *See id.* at 427, 435–36 (a contract provision allowing a non-breaching party to "accelerate the balance of any amounts owed" did not require unearned interest to be collected, but rather "merely accelerate[d] the payments due" and therefore did not violate public policy); *see also Paramount Pictures Corp. v. Johnson Broad. Inc.*, No. CIV.A.H 04 03488, 2006 WL 367874, at *7 (S.D. Tex. Feb. 15, 2006) (enforcing a contract provision providing that "the entire unpaid balance of all license fees payable under this Agreement shall immediately become due and payable" in the event of default or breach).

Public policy also limits the enforceability of liquidated damages clauses. *See, e.g., Permian Petroleum Co.*, 934 F.2d at 645. "Liquidated damages clauses fix in advance the

compensation to a party accruing from the failure to perform specified contractual obligations." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 664 (Tex. 2005). "[A]n enforceable liquidated damages contract provision establishes an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Atrium Med. Ctr.*, 595 S.W.3d at 192 (quotation marks and quoting reference omitted). "A damages provision that violates the rule of just compensation, however, and functions as a penalty, is unenforceable." *Id.* In other words, "[t]he policy of just compensation acts to invalidate [liquidated damages clauses] when they are punitive in nature." *Permian Petroleum Co.*, 934 F.2d at 645.

Section 2.7.4 accelerates the payments due to PCS over the life of the Agreement. That is the *only* thing that Section 2.7.4 does. It does not impose a monetary penalty for a breach. It merely sets the damages measure at what would be due over the 36-month contract period. One Texas court has found that sufficient to conclude that contract damages provision is enforceable. *See Crossmark, Inc.*, 124 S.W.3d at 436.[10]

Nonetheless, Section 2.7.4 also fits the definition of a liquidated damages clause because it "fix[es] in advance the compensation to a party accruing from the failure to perform specified contractual obligations." *See Valence Operating Co.*, 164 S.W.3d at 664; *see also Steadfast Ins. Co. v. SMX 98, Inc.*, No. CIV.A. H-06-2736, 2008 WL 62199, at *7 (S.D. Tex. Jan. 3, 2008) ("Liquidated damages provisions fix in advance the payment for breach, but the amount may be expressed as either a sum certain or as a rate or formula that contains one or more variables.").

---

[10]  PCS asserts that "the Fifth Circuit and Texas courts have consistently recognized the key distinction between acceleration clauses and liquidated damages provisions," but cites only *Crossmark*. (Docket Entry No. 133 at 3).

"Under Texas law, the rule against punitive liquidated damages clauses applies to agreements that fix damages in advance of a breach." *Permian Petroleum Co.*, 934 F.2d at 645.

The Texas Supreme Court has established a multi-step inquiry to determine whether a liquidated damages provision is enforceable. *Atrium Med. Ctr., L.P.*, 595 S.W.3d at 190, 192–93. The party seeking liquidated damages must show that, based on the circumstances when the agreement was made: (1) "the harm caused by the breach [was] incapable or difficult of estimation"; and (2) "the amount of liquidated damages called for is a reasonable forecast of just compensation." *Id.* at 192 (quoting reference omitted). If those conditions are met, the provision is enforceable unless the breaching party demonstrates that "an unbridgeable discrepancy exists between [the] liquidated damages provision[] as written and the unfortunate reality in application." *Id.* at 193. PCS has met its burden on the first two requirements, and Dispatch has failed to show why Section 2.7.4 should not be enforced.

In June 2022, when the Agreement was executed, the parties did not know, and could not estimate, the damages or harm PCS would suffer if Dispatch breached, other than by looking to the amounts Dispatch was required to pay. PCS has shown that although it charged Dispatch monthly over the 36-month Agreement, much of PCS's work would take place in the first months after Dispatch entered into the Agreement, if not before. PCS would continue to provide support to Dispatch as needed through the contract period, including addressing problems as they arose. If Dispatch had not stopped paying when it did, PCS would have received $1,437,426 more from Dispatch. That is easy to calculate. If that is the only calculation needed to determine benefit-of-the-bargain damages, then Section 2.7.4 merely awards PCS benefit-of-the-bargain damages. But calculating benefit-of-the-bargain damages also requires subtracting "any cost or other loss [the non-breaching party] has avoided by not having to perform." *See Qaddura*, 141 S.W.3d at 889.

There is no basis for calculating those costs, as the parties would have anticipated at the time the Agreement was signed.

The nature of PCS's business model, which provides the same basic software to all clients, makes it impossible to calculate PCS's damages resulting from one customer's breach at any given point in time. Shaw testified that, because PCS provides essentially the same software to all its customers, PCS's costs to provide software to a new customer like Dispatch "are very front-loaded." Tr. (Day 1) at 40. Those costs include subscription fees for services that enable PCS to launch and manage a cloud-based platform through which all its customers access the software applications. *Id.* For example, PCS admitted a monthly invoice of $116,269.76 paid to Microsoft Azure for cloud-based services that support all of PCS's customers. *Id.* at 55, 58; PX 17. The cost increases with more customers and more data, but PCS cannot attribute a portion of the monthly fee to an individual customer. Tr. (Day 1) at 58, 113. The same reasoning explains why the software capabilities that PCS developed for Dispatch were offered to all customers. *See, e.g.*, DX 131. As a "diamond package" subscriber, Dispatch had access to all the capabilities and functionalities offered within the platform, regardless of which customer they were originally developed for. Tr. (Day 1) at 20. The "multi-tenant" nature of PCS's software and business development, as well as the frontloaded nature of the costs, explains why Section 2.7.4 was necessary to ensure that PCS would be justly compensated for a material breach of the Agreement regardless of when it occurred.

The structure of the Agreement also shows that the parties knew actual damages would be difficult to calculate if Dispatch breached and used Section 2.7.4 to set a reasonable forecast of just compensation. PCS incurs most of the costs to provide software to an individual customer while implementing the software, customizing the software, and responding to issues that the

customer encounters, particularly—but not exclusively—at the beginning of the contract period. *See id.* at 40–41. Although the monthly payment schedule in the Agreement makes it easy to calculate Dispatch's expenditures at any given point in the contract period, the same is not true for PCS. The monthly price set out in the Agreement factors in PCS's up-front and ongoing costs and distributes them over the 36-month contractual period. *Id.* at 41. Shaw testified that the frontloaded nature of PCS's costs was the reason the parties included Section 2.7.4 in the Agreement. *Id.* Dispatch presented no contrary evidence.

Because PCS has met its burden, the court next asks whether Dispatch has shown "that the liquidated damages provision was otherwise unreasonable when compared with [PCS's] actual damages." *See Atrium Med. Ctr.*, 595 S.W.3d at 196. Dispatch has not.

Dispatch is wrong to say that "PCS's actual loss as a result of Dispatch's breach amounts to a total of $18,106.33." (Docket Entry No. 135 at 8) (citing Docket Entry No. 87 at 7). Dispatch incorrectly cites this court's summary judgment opinion for that erroneous contention. *Id.* On summary judgment, the court held "that Dispatch materially breached the Agreement by failing to pay the third monthly installment of the Implementation Fee," or $18,106.33. (Docket Entry No. 87 at 7). Before "defer[ring] consideration of the amount of damages until after the remaining liability issues have been resolved at trial," the court noted—as detailed in this opinion—that parties proving all elements of a breach of contract claim are generally entitled to damages that place them "as nearly as possible in the position that [they] would have occupied had the defaulting party performed the contract." *Id.* (quoting *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001)). Compensating PCS only for the invoices that Dispatch did not pay before PCS terminated the Agreement would not do that. Dispatch's proposed damages calculation would also fall far short of restoring PCS to its pre-Agreement position, given the resources that PCS

expended between June 2022 and November 2022 to configure, implement, and support the software for Dispatch. Under Dispatch's proposed damages calculation, PCS would suffer significant uncompensated economic loss because Dispatch breached the Agreement.

Dispatch also argues, unpersuasively, that Section 2.7.4 is a penalty because it applies regardless of the magnitude of the breach. Under Texas law, "[a] provision becomes a penalty if it provides for unreasonable damages for trivial breaches as well as reasonable damages for major breaches." *Steadfast Ins. Co.*, 2008 WL 62199, at \*13 (quoting *Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 727 (Tex.App.—Houston [1st Dist.] 1984, no writ)).[11] "This is so even if the claim at issue is actually a more major breach." *Id.*

Section 2.7.4 applies if PCS terminates the Agreement under any provision other than Section 2.4. PX 1 § 2.7.4. PCS terminated the Agreement under Section 2.5, which applies only to material breaches, and Section 2.3, which applies if Dispatch "(a) fails to pay any amount when due hereunder, and such failure continues more than three . . . days after Client's delivery of written notice thereof[,] or (b) breaches any of its obligations under Sections 4.8, 9 or 12." *Id.* §§ 2.3, 2.5.

Dispatch hypothesizes that a failure to timely pay the first installment of the Implementation Fee would be a trivial breach warranting termination under Section 2.3 and resulting in "draconian penalties" if Section 2.7.4 was enforced. (Docket Entry No. 135 at 7–8). Failure to pay is not a trivial breach. Termination of the Agreement after Dispatch fails to pay one installment of the Implementation Fee results in damages to PCS that far exceed the amount of

---

[11] Contrary to Dispatch's argument, *Steadfast* is easily distinguishable from this case because the liquidated damages clause at issue was a "premium-charge provision" imposing a flat rate additional premium that was "more than twice the original premium amount" as a penalty for both minor and major breaches. *See* 2008 WL 62199, at \*1, \*11–\*13. Section 2.7.4 merely accelerates the payments that would have become due under the Agreement, and Dispatch has not shown that Section 2.7.4 applies to any minor breaches.

Dispatch's single nonpayment.[12]  That is especially true for a breach that occurs early in the contract period.  Section 2.7.4 would be reasonable as applied to the hypothetical breach for the same reason that it is reasonable as applied to Dispatch's breach in this case: the accelerated damages represent just compensation given that PCS's costs are heavily frontloaded and spread across customers, making it impossible to calculate actual damages at any given point when Dispatch breaches.  Using Dispatch's payment obligations to approximate PCS's actual damages is appropriate.[13]

Section 2.7.4 is neither a penalty nor a windfall.  Because Section 2.7.4 merely accelerates Dispatch's payment obligations under the Agreement without imposing a penalty, it is enforceable as the parties' agreed-to measure of damages.  *See Crossmark, Inc.*, 124 S.W.3d at 435–36.  Even if Section 2.7.4 is a liquidated damages clause, it is enforceable because it "adhere[s] to the principle of just compensation."  *See Atrium Med. Ctr.*, 595 S.W.3d at 192 (quoting *Stewart*, 245 S.W.2d at 486).

Under the Agreement, Dispatch was obligated to pay PCS a $108,639 Implementation Fee and $1,404,000 in Subscription Fees, totaling $1,512,639.  PX 1 at 18–19.  Dispatch paid the June Subscription Fee and two out of six installments of the Implementation Fee, totaling $75,213.  PX 5; PX 7; PX 9.  Under Section 2.7.4, Dispatch must pay the difference between what it owed and what it paid—$1,437,426—in damages to PCS.

---

[12]  Dispatch's hypothetical again exemplifies its erroneous view that PCS's actual damages are limited to the unpaid invoice amounts.  For the reasons explained in this opinion, that perspective fundamentally misunderstands the nature of the software and services provided, the parties' relationship and obligations to each other, and what the parties understood about PCS's business model when they signed the Agreement.  The parties knew that early in the contract period, PCS's investments into fulfilling its obligations under the Agreement would far exceed what it was paid by Dispatch.  They contracted to spread Dispatch's compensation to PCS over the 36-month period.

[13]  Dispatch "adduced no evidence that mitigation would have reduced [PCS's] actual damages such that liquidated damages no longer served as just compensation."  *See Atrium Med. Ctr.*, 595 S.W.3d at 197.

### III.   Conclusion

Dispatch breached the Agreement by failing to pay the third monthly installment of the Implementation Fee and the Subscription Fees for September, October, and November 2022.  As damages for that breach, Dispatch owes PCS $1,437,426.  PCS must submit a proposed final judgment, consistent with the court's findings and conclusions, no later than August 25, 2025.  PCS may submit its attorneys' fee application in accordance with Rule 54 of the Federal Rules of Civil Procedure, no later than September 10, 2025.

SIGNED on August 19, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge